**BLUE CROSS ASSOCIATION et al., Plaintiffs,**

v.

**Joseph A. CALIFANO et al., Defendants.**

**MISSOURI HOSPITAL ASSOCIATION et al., Plaintiffs,**

v.

**Joseph A. CALIFANO, Jr., et al., Defendants.**

Nos. 79–0213–CV–W–2, 79–0226–CV–W–2.

United States District Court,
W. D. Missouri, W. D.

June 29, 1979.

Thos. E. Deacy, Jr., Spencer J. Brown, Phillip B. Grubaugh, Deacy & Deacy, Kansas City, Mo., for plaintiffs Blue Cross Ass'n & Blue Cross Hosp. Serv., Inc. of Mo.

James C. Munson, James D. Adducci, Kirkland & Ellis, Chicago, Ill., for plaintiffs Blue Cross Ass'n.

Max O. Bagby, B. W. Jacob, Bagby, Winger & Jacob, Kansas City, Mo., for plaintiff Blue Cross of Kansas City.

Robert F. Schlafly, Schlafly, Griesedieck, Ferrell & Toft, St. Louis, Mo., for plaintiff Blue Cross Hosp. Serv., Inc. of Mo.

Carl J. Helmstetter, Spencer, Fane, Britt & Browne, Kansas City, Mo., for intervenor-plaintiff American Hospital Ass'n and for plaintiff Kansas City Area Hospital Assn.

Ronald S. Reed, Jr., U. S. Atty., Larry D. Coleman, Asst. U. S. Atty., Kansas City, Mo., Paul Blankenstein, Barbara L. Gordon, Dept. of Justice, Lloyd M. Weinerman, Dept. of HEW, Washington, D. C., Paul P. Cacioppo, Regional Atty., Dept. of HEW, Bruce R. Granger, Asst. Regional Atty., Dept. of HEW, Kansas City, Mo., for defendants.

John C. Shepherd, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for plaintiff Hospital Ass'n. of Metropolitan St. Louis.

Cullen Coil, Carson, Monaco, Coil, Riley & McMillin, Jefferson City, Mo., for plaintiff Missouri Hospital Ass'n.

Wayne T. Stratton, Goodell, Stratton, Edmonds, Palmer & Wright, Topeka, Kan., for plaintiff Kansas Hospital Assn.

## MEMORANDUM OPINION AND JUDGMENT

COLLINSON, District Judge.

### I.

This is an action for declaratory and injunctive relief. The Court has jurisdiction under the federal question provisions of 28 U.S.C. § 1331. Two cases were filed seeking the same relief on essentially the same grounds. The named defendants are identical. The cases are hereby consolidated for all purposes pursuant to Rule 42(a), Fed.R. Civ.P.

Plaintiffs seek to enjoin defendants from procuring a Medicare Part A Intermediary Contract for the State of Missouri and the metropolitan Kansas City area,[1] for the operational period of January 1, 1980 to December 31, 1982, pursuant to a Department of Health, Education and Welfare Request for Proposal dated January 31, 1978.[2] Plaintiffs initially sought a preliminary injunction. A conference was held on May 4, 1979 and it was determined that the entire controversy would be decided on cross-motions for summary judgment. Rule 65(a)(2), Fed.R.Civ.P. These motions were filed May 21, 1979. Many of the relevant facts have been stipulated. The record before the Court consists of the initial pleadings, the stipulations, additional proposed findings submitted by each side, affidavits submitted by each side, the briefs, and all exhibits. The following discussion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R.Civ.P. Factual findings on matters which have not been stipulated have been made from the affidavits.[3] There are, however, no disputed material facts. The Court holds that there is no genuine issue as to any material fact and that plaintiffs are entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.

### II.

Plaintiffs in case No. 79–0213 are the Blue Cross Association ("BCA"), Blue Cross of Kansas City and Blue Cross Hospital Services, Inc. of Missouri. BCA is a non-profit Illinois corporation with its principal place of business in that state. BCA is a member organization of Blue Cross Plans, which are individual corporations. Blue Cross of Kansas City is a non-profit Missouri corporation with its principal place of business in this state, although it is also qualified to do business in Kansas. Blue Cross Hospital Services, Inc. of Missouri is a non-profit Missouri corporation with its principal place of business in this state.

Plaintiffs in case No. 79–0226 are the Missouri Hospital Association, the Kansas City Area Hospital Association, the Hospital Association of Metropolitan St. Louis, and the Kansas Hospital Association. The former three associations are Missouri corporations consisting of groups of hospitals located in Missouri. The Kansas Hospital Association is a Kansas corporation consisting of several hospitals located in Kansas. By order entered May 29, 1979, the American Hospital Association ("AHA") was granted leave to intervene as a plaintiff pursuant to Rule 24(b), Fed.R.Civ.P.

There are two defendants in each case. Joseph A. Califano, Jr., is Secretary of the United States Department of Health, Education and Welfare ("Secretary"). Leonard Schaeffer is Administrator of the Health Care Financing Administration, an agency within HEW. These defendants are re-

---

1. This area includes 30 counties in Missouri and 2 counties in Kansas.

2. "Part A" refers to the statutory provisions relating to hospital insurance benefits for aged and disabled persons. Specifically, the term refers to Part A of Subchapter XVIII of the Social Security Act. 42 U.S.C. §§ 1395c–1395i–2.

3. Plaintiffs have submitted affidavits from the following: Bernard R. Tresnowski, Executive Vice-President of The Blue Cross-Blue Shield Association, and C. Duane Dauner, President of the Missouri Hospital Association. Defendants have submitted affidavits from the following: Dean R. Mordy, Regional Medicare Director of the Health Care Financing Administration, Kansas City Region, HEW and Martin L. Kappert, Director of the Division of Contract Administration, Medicare Bureau of HCFA, HEW.

sponsible for administering the Medicare program pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*

### III.

BCA currently is, and has been since the inception of the Medicare program, an intermediary and has been, since the inception of the Medicare program, serving as a Part A intermediary for providers of medical services located throughout the United States. BCA attained its status as a Part A intermediary through the nomination process set forth in 42 U.S.C. § 1395h. That statute provides in pertinent part:

(a) If any group or association of providers of services [i. e., hospitals] wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization providing for the determination by such agency or organization . . . of the amount[s] of the payments required pursuant to this part to be made to such providers . . ., and for the making of such payments by such agency or organization to such providers. . . .

BCA was originally nominated as an intermediary by AHA at the inception of the Medicare program. AHA had distributed declarations of intent to state hospital associations which distributed these declarations to the providers. The declarations of intent were executed by the providers and returned to the state associations which forwarded a listing of those providers declaring their intent to nominate BCA to AHA which made the official nomination. Since this original nomination, BCA has entered into a succession of contracts with the Secretary to function as an intermediary throughout the United States. In Missouri and the metropolitan Kansas City area,

BCA is currently serving as a Medicare Part A intermediary for approximately 244 out of 268 providers.[4] None of the nominations have been withdrawn, terminated, or changed in any way.

The intermediary agreement currently in effect between the Secretary and BCA is for a one-year period ending September 30, 1979, subject to certain exceptions which are not relevant here. BCA does not actually perform the day-to-day administration of the Medicare Part A program. These functions are performed through subcontracts between BCA and its member plans. Under these subcontracts, the member plans have the day-to-day contact with the providers, pay claims for covered services and audit providers to determine the proper cost basis for payment to them for covered services. BCA presently does not have the capacity to perform these claims payment and provider audit functions.

Blue Cross of Kansas City has served as a subcontractor to BCA in its performance of Part A Medicare functions in the metropolitan Kansas City area, and Blue Cross of Kansas City is presently party to a subcontract with BCA for the performance of such functions. Blue Cross Hospital Services, Inc. has served as a subcontractor to BCA in its performance of Part A Medicare functions in the State of Missouri outside the metropolitan Kansas City area, and is presently party to a subcontract with BCA for the performance of such functions. Any subcontract between BCA and its member plans is subject to approval by the Secretary.

BCA performs liaison activities between its various member plans and Congress, various governmental and regulatory agencies, organizations within the health care industry and other groups. It sets up standards, rules and qualifications for member plans and reviews their performance. It also performs certain services for its member plans such as the transfer of funds and credit, the provision of a telecommunication network,

---

4. In addition to BCA, Aetna Life & Casualty and Mutual of Omaha Insurance Company have been nominated as intermediaries by certain providers and are presently serving as such.

and various technical and consultative services. In its role as a Medicare Part A intermediary, BCA performs many of the same functions that it performs in its private business operations. Thus it: (1) maintains a telecommunication network which is used for the determination of the eligibility of individuals for coverage under Medicare; (2) assists in preparing manuals and operating instructions concerning Medicare; (3) provides data processing services; (4) serves as a center for communications between providers and the Secretary; (5) makes management studies in Medicare; (6) participates in and performs statistical and research studies as requested by the Secretary; (7) assists Medicare beneficiaries and subscribers to its private health care programs with inquiries regarding their respective health care programs; (8) provides a provider appeal mechanism for reimbursement disputes; and (9) assures the performance of the subcontracting plans.

### IV.

On or about February 6, 1979, plaintiffs received a "Request for Proposal Medicare Part A Intermediary to Serve in the State of Missouri and the Metropolitan Kansas City Area," dated January 31, 1979 (RFP). The RFP announced that:

> The Government wishes to select a Medicare intermediary for the administration of the Part A program for the State of Missouri and the Metropolitan Kansas City area . . . through a competitive offer, firm fixed price approach.
>
> \* \* \* \* \* \*
>
> This Request for Proposal (RFP) and the resultant contract are intended to test the cost-benefit effect of assigning one organization to serve as intermediary for a specified geographic area. In addition to testing competitive fixed price con-

tracting in the selection of Part A intermediaries, this experiment is designed to test the potential effeciencies [sic] of merging several contractor operations. It will also test the potential for more uniform application of program requirements and more effective control over provider reimbursement.

\* \* \* \* \* \*

The Government is soliciting fixed price proposals for a Medicare Part A intermediary contract for the State of Missouri and the Metropolitan Kansas City area under the general authority of section 1816 of the Social Security Act and the experimental authority of 42 U.S.C. § 1395b–1. It is intended that the procurement will test the viability and impact of a competitive fixed price contractual arrangement in the administrative conduct of the Medicare Part A program. The Government will enter into a firm fixed price contract with the successful offeror. The fixed price will be for providing the full range of Part A intermediary services over the term of the contract, beginning July 1, 1979, and ending December 31, 1982.[5]

Under the terms of the RFP, the selected bidder will be the Part A intermediary for all providers within the affected area, i. e., the State of Missouri and the Metropolitan Kansas City area, irrespective of the nominations of the individual providers in this respect. The RFP makes no provision whatsoever for nomination by any group of providers of the intermediary that will make the Medicare Part A payments to the providers. Generally speaking, the RFP would, among things, (1) let a contract to one intermediary for the entire affected area; (2) preclude the nomination of intermediaries by providers; (3) preclude the subcontracting of certain principal interme-

---

**5.** RFP, p. 1–2. Although the RFP states that the Secretary's authority is found in both section 1816 of the Social Security Act (42 U.S.C. § 1395h) and in 42 U.S.C. § 1395b–1, it. has become clear that he does not in fact rely on the former statutory provisions. The Secretary's position in this case is that his authority to issue the RFP is found exclusively in the

"experimental statute," 42 U.S.C. § 1395b–1. See, Defendant's Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, pp. 8–9, 10–15; Affidavit of Martin L. Kappert, ¶ 4, filed May 21, 1979 as Ex. A to Defendant's Memorandum in Support of Their Motion for Summary Judgment, etc.

diary functions; and (4) require a fixed price contract instead of the current cost reimbursement type contract.

The RFP requires direct performance, and thereby prohibits subcontracting, of many of the principal intermediary functions listed in 42 U.S.C. § 1395h(a). These functions include (1) the determination of the amount of payments due to providers; (2) making payments to providers; (3) assisting institutions, facilities or agencies to qualify as providers of services and providing consultative services to such providers to enable them to establish and maintain fiscal records required by law; and (4) engaging in utilization review activities. The only intermediary functions which can be subcontracted for are provider audits, data processing support services and, as appropriate, automatic desk reviews.[6] BCA presently does not have employees or physical facilities in Missouri and the Metropolitan Kansas City area, or in any other location, which would be necessary to directly perform these principal intermediary functions.

The RFP's qualification criteria for bidders are: (1) compliance with state and local licensing requirements; (2) compliance with specified financial stability requirements; (3) an agreement to physically establish and maintain all intermediary functions, other than computer processing, within the affected area; and (4) an agreement to use best efforts to recruit and hire capable persons displaced by the change of intermediary.[7] These qualification criteria

preclude BCA, as it presently operates, from bidding for the proposed contract. The criteria do not, however, preclude bids by Blue Cross of Kansas City or by Blue Cross Hospital Service, Inc. of Missouri.[8]

Each bid proposal will be subjected to a formal evaluation process involving consideration of the offeror's technical capabilities, its experience with Medicare and other health insurance programs, and the offered price. Each offer will be scored on the basis of these factors. The technical and price factors are to be evaluated consistently for each bid. However, the experience factor will be evaluated in different ways for different offerors. The RFP specifies six types of relevant experience.[9] Each type is assigned an ". . . experience rating factor which summarizes Government judgment as to the relative value of each type of experience." RFP, p. 34. The quality of the particular offeror's past performance is to be ascertained from "knowledgeable sources," which are defined as ". . . those organizations which make periodic assessments of the quality of services provided or who have been associated with the offeror in a contractual relationship and can provide an assessment of the offeror's performance." RFP, p. 35. For offerors with previous Medicare experience, the Secretary will rely primarily on the offeror's Annual Contractor Evaluation Report (ACER).[10] Insurance company offerors with no previous Medicare experience will be evaluated by use of Best's

---

6. RFP, pp. 15–16; 37–44.

7. RFP, p. 4–5.

8. Representatives of Blue Cross of Kansas City announced at the May 4 conference that it would in fact be submitting a bid under the RFP. This has presumably been done.

9. The six types are listed as (1) Medicare Part A; (2) Medicaid-functional responsibilities equivalent to Medicare Part A; (3) Audit Firms having experience with Medicare principles of reimbursement and cost-basis audits; (4) Medicare Part B; (5) Other Health Insurance Programs; and (6) Other Related Experience. RFP, p. 37.

10. An ACER is a report prepared by HEW which evaluates the claims processing and administrative work of Medicare contractors. The report analyzes seven basic categories and thus provides a detailed and comprehensive performance evaluation. The seven categories are: (1) claims process; (2) coverage and utilization safeguards; (3) program reimbursement; (4) electronic data processing operations; (5) beneficiary services and professional relations; (6) fiscal management; and (7) contractor management. Each contractor's ACER is prepared by a team of HEW employees after an on-site review, preparation of certain reports, consideration of input from the contractor and any follow-up inspection deemed appropriate.

Insurance Reports.[11] The quality rating factor for other offerors will be evaluated through contacts with ". . . a representative number of references."[12] RFP, p. 35. References are also to be contacted if either an available ACER or Best Report provides insufficient information. Offerors with prior Medicare Part A experience will automatically receive a higher experience rating factor than those offerors without such experience. However, even though offerors with prior Part A experience automatically receive a higher *rating factor* than offerors without such experience, it is possible for the inexperienced offeror to obtain a higher experience *score*.

The Secretary relies on 42 U.S.C. § 1395b–1 for authority to issue the RFP and to carry out the experiment. In pertinent part, that statute provides:

(a)(1) The Secretary of Health, Education, and Welfare is authorized, either directly or through . . . contracts with public or private agencies, institutions, and organizations, to develop and engage in experiments and demonstration projects for the following purposes:

\* \* \* \* \* \*

(F) to determine whether, and if so which type of, fixed price or performance incentive contract would have the effect of inducing to the greatest degree effective, efficient, and economical performance of agencies and organizations making payment under agreements or contracts with the Secretary for health care and services under health programs established by this chapter;

\* \* \* \* \* \*

(b) In the case of any experiment or demonstration project under subsection (a) of this section, the Secretary may waive compliance with the requirements of this subchapter and subchapters V and XIX of this chapter insofar as such requirements relate to reimbursement or payment on the basis of reasonable cost, or (in the case of physicians) on the basis of reasonable charge, or to reimbursement or payment only for such services or items as may be specified in the experiment; and costs incurred in such experiment or demonstration project in excess of the costs which would otherwise be reimbursed or paid under such subchapters may be reimbursed or paid to the extent that such waiver applies to them (with such excess being borne by the Secretary).

\* \* \* \* \* \*

The provisions of the RFP itself, and the Secretary's position that this experimental statute gives him the authority to ignore the provider nomination statute quoted above are the basis for this lawsuit. However, the Court must first resolve questions of jurisdiction.

## V.

The government has raised the jurisdictional question of standing as to all plaintiffs. The standing question is whether the plaintiffs are entitled to have the Court decide the dispute.

This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. . . . In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society.

*Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974).

With respect to the Blue Cross plaintiffs, the government contends that none have been injured in fact, that there is no causal relationship between the challenged action

---

**11.** Best's Insurance Reports is a publication that analyzes and rates the financial strength of insurance companies. This publication is a widely accepted reference on performance of insurance companies and was a resource tool used during the original selection of contractors when the Medicare program was being established in 1965–66.

**12.** The RFP directs all offerors to provide references for themselves and their major subcontractors. When references are to be used to develop an offeror's quality rating factor, the Secretary will send them a questionnaire. RFP, p. 35.

and any alleged injury, that these plaintiffs cannot sue as unsuccessful bidders, and that none of these plaintiffs are within the zone of interests protected under the statutes involved in this case. With respect to the hospital association plaintiffs, the government contends that they have not been injured in fact and that they lack associational standing to represent the interests of their members. The Court holds that all hospital association plaintiffs and BCA have standing to challenge the issuance and content of the RFP. Specifically, the Court holds that these plaintiffs are arguably within the zone of interests protected by 42 U.S.C. § 1395h(a) and that these plaintiffs have sufficiently demonstrated an actual or threatened injury in fact. However, the Blue Cross Plans are not arguably within the statutorily protected zone of interests because the rights they assert are purely contractual. Accordingly, the Court lacks jurisdiction to consider their claims.

■ It must be emphasized at the outset that in considering the standing issue, the Court is concerned only with the identity of the parties. A fundamental aspect of the standing doctrine is that the Court should examine only the party asserting the claim and not the claim itself. *Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Since the focus is on the party and not the claim, standing questions must be resolved case-by-case. The necessity for a case-by-case inquiry was articulated by the Supreme Court in the leading case in this area, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (hereinafter *Data Processing*):

Generalizations about standing to sue are largely worthless as such. One generali-

zation is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to "cases" and "controversies."

■ The Court viewed Article III [13] as the "starting point" for standing analysis and held that the constitutional case or controversy requirement was met where ". . . the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Data Processing, supra* at 152, 90 S.Ct. at 829. Requiring a plaintiff to allege actual or threatened injury in fact insures that the dispute ". . . will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Data Processing, supra* at 152, 90 S.Ct. at 829.[14] In a companion case, the Court emphasized that the overriding consideration is whether the plaintiffs ". . . have the personal stake and interest that impart the concrete adverseness required by Article III." *Barlow v. Collins*, 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970). A "personal stake" in the outcome of the asserted claim and an adversary relationship with the named defendants have consistently been viewed as inherent requirements of federal judicial power. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin, supra* 422 U.S. at 498–499, 95 S.Ct. 2197 (1975); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Sierra Club v. Morton*, 405 U.S. 727, 734–735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See generally, Wright *Law of Federal Courts*, § 13, p. 49 (3d ed. 1976).

13. U.S.Const., Art. III, § 2, ¶ 1, provides in part: The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority; . . .; to all controversies to which the United States shall be a party; to Controversies between two or more States; between a State and Citizens of another State;—between Citizens of different

States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

14. The quoted language is from *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Allegations of injury in fact satisfy the constitutional requirements. Apart from Article III considerations, however, the standing doctrine involves a measure of judicial "self-restraint." *Data Processing, supra* 397 U.S. at 154, 90 S.Ct. 827, *citing Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In other words, the federal courts should not examine the merits of a particular claim unless Congress or the Constitution has arguably authorized the exercise of judicial power in the particular situation. This principle is embodied in the rule that the plaintiff must be one whose interests are arguably within the zone of interests protected or regulated by the statute or constitutional provision involved in the case. The focus here is on the word "arguably," since this inquiry is not whether the plaintiff has a protectable "legal interest," but whether the statute or constitutional provision upon which the claim is based arguably encompasses a person or entity in plaintiff's position. As stated by the Court:

> The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Data Processing, supra*, 397 U.S. at 153, 90 S.Ct. at 830.[15]

The line distinguishing this inquiry from an examination of the merits of a plaintiff's claim is very hazy but it must be drawn in every case. Whether a particular plaintiff's interests are *arguably* protected is a question of standing; whether they are *actually* protected is a question which goes to the merits of the case. *Investment Company Inst. v. Camp*, 401 U.S. 617, 620, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). The necessary separation of the standing question from an inquiry on the merits was emphasized by Justices Brennan and White concurring in part and dissenting in part from the majority opinions in *Data Processing*, and its companion case, *Barlow v. Collins, supra*, 397 U.S. at 167–173, 90 S.Ct. 832. They viewed the zone of interests aspect of the standing inquiry as an unfortunate gloss which might lead to a superficial discussion of the merits rather than ". . . the focused and careful decision on the merits to which [the plaintiffs] are clearly entitled." *Barlow v. Collins, supra* 397 U.S. at 168, 90 S.Ct. at 839.[16] The majority opinion, though, cautioned against examination of the merits of plaintiff's claim by emphasizing that the question of standing is answered by asking whether the plaintiff's interests are "arguably" within the zone of interests protected by the law relied upon as the basis for the claim. *Data Processing, supra*, 397 U.S. at 153, 90 S.Ct. 827.

**15.** The Court's discussion of the zone of interests test made reference to the Administrative Procedure Act, 5 U.S.C. §§ 701–706. This action is not under that Act. This case involves what is commonly referred to as "non-statutory review." Federal jurisdiction is based on the general federal question statute, 28 U.S.C. § 1331, and plaintiffs seek injunctive and declaratory relief. Actions of this nature are called "non-statutory" because they have evolved from common law and equity precedents, although the declaratory judgment is now specifically controlled by statute, 28 U.S.C. §§ 2201, 2202. See generally Mezines, Stein & Gruff, *Administrative Law*, Vol. 5, § 43.02[2], p. 43–15 (1979). Although most of the case law regarding standing has been developed under the Administrative Procedure Act, particularly the "person aggrieved" provisions of 5 U.S.C. § 702, it is clear that the concepts and tests set forth in *Data Processing* apply with equal force to all cases, even in the absence of "person aggrieved" language in the relevant statute. See, *e. g., Ballerina Pen Company v. Kunzig*, 140 U.S.App.D.C. 98, 101, 433 F.2d 1204, 1207 (1970); *Duke City Lumber Co. v. Butz*, 382 F.Supp. 362, 369 n. 15 (D.D.C. 1974), *aff'd in part*, 176 U.S.App.D.C. 218, 539 F.2d 220 (1976), *cert. den.* 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977).

**16.** Other courts, including our court of appeals, have voiced similar criticisms. *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1212 (8th Cir. 1972). However, the test has been routinely and consistently applied. *Rodeway Inns of America, Inc. v. Frank*, 541 F.2d 759 (8th Cir. 1976), *cert. den.* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411 (8th Cir. 1976).

In summary, standing to assert a particular claim exists where the plaintiff alleges actual or threatened injury in fact, economic or otherwise, and is arguably within the zone of interests protected or regulated by the statute or constitutional provision in question. Further, in evaluating challenges to standing, the Court must avoid scrutinizing the merits of the asserted claim. These general principles must be applied to the plaintiffs in these two cases to determine whether each has sufficiently alleged injury in fact and to determine whether each plaintiff is arguably within the zone of interests protected by the provider nomination statute, 42 U.S.C. § 1395h.

With respect to the standing of the hospital association plaintiffs, the only issue involves injury in fact. The government contends that neither the hospital association plaintiffs[17] nor their provider members have alleged the requisite injury to give them standing to challenge the issuance or the contents of the RFP. The government tacitly concedes that these plaintiffs are arguably within the zone of interests protected by 42 U.S.C. § 1395h(a) by contending that the Blue Cross plaintiffs are not arguably protected.[18] The government's position appears to assume that these plaintiffs rely on injury to their provider members to establish their associational standing and that any threatened injury to the providers is "speculative and conjectural," and "totally hypothetical and vague."[19] The government's position, however, does not accurately characterize the injury in fact alleged by the hospital association plaintiffs. Their position, consistently taken in their complaint and in their briefs, is that they, as associations of providers, have the statutory right to nominate the Part A Medicare intermediary with whom they wish to deal and that this right is being taken away by the government's action. Thus, they have alleged that they are associations of providers, as defined in the relevant provisions of the Social Security Act, that they have nominated BCA as their intermediary and that these nominations have not been ". . . withdrawn, terminated or changed in any way." Complaint, ¶ 8. They have alleged that the RFP was issued ". . . in obvious disregard of the existing nominations." Complaint, ¶ 10. They have alleged that the RFP makes "no recognition" of their statutory right, that the RFP "is on its face illegal" because of this alleged deficiency, and that they ". . . will be irreparably harmed by reason of the loss of their respective statutory rights to nominate and choose the intermediaries with whom they shall deal." Complaint, ¶¶ 11, 13, 15. The injury in fact, then, consists of the alleged injury to the associations themselves resulting from the alleged denial of their asserted statutory nomination rights.[20]

17. The American Hospital Association was permitted to intervene after the filing of briefs, Order of May 29, 1979, and, consequently, the arguments regarding the standing of the hospital association plaintiffs apply only to MHA, KHA, the Kansas City Area Hospital Association and the Hospital Association of Metropolitan St. Louis. AHA's intervention was permitted under the provisions of Rule 24(b), Fed.R. Civ.P., because it was the entity who actually nominated BCA as the Part A intermediary in the area affected by the RFP. See Part II, *supra.* At the May 4 conference, defense counsel indicated that the government might challenge the standing of the hospital association plaintiffs on the ground that the actual nomination of BCA was made by AHA. That contention has not been raised in the government's briefs and, in any event, is without merit in view of AHA's permissive intervention.

18. Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 33–35. It seems clear, and the Court so holds, that the hospital association plaintiffs are arguably within the zone of interests protected by the statute since it expressly confers upon them the right to nominate an intermediary.

19. Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 36.

20. Plaintiff's Reply Memorandum, filed May 5, 1979, p. 7; Plaintiff's Supplemental Memorandum, filed May 26, 1979, p. 15. Thus, all of the cases relied upon by the government involving the right of an association to represent its members' interests where the association itself has not been injured are irrelevant. *E. g., Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

All of the hospital association plaintiffs are faced with the fact that they and their members will be dealing with an intermediary in this area that they have not nominated. Even though a contract has not yet been awarded, the threatened change in the way the Part A Medicare program is administered in the area affected by the RFP creates the necessary injury in fact.[21] It is true, as contended by the government, that neither the associations nor their provider members have any kind of vested right to deal with a particular nominated intermediary since 42 U.S.C. § 1395h(e) allows the Secretary to refuse a nomination or to reassign providers to another Part A contractor. It is also true, though, that these plaintiffs are claiming an illegal deprivation of their nomination rights and claiming that unless enjoined, the Secretary intends to enter into a new Part A contract that makes no recognition of their nominee. This threatened change in the status quo, in alleged violation of express statutory rights, confers standing upon these plaintiffs to challenge the issuance and the contents of the RFP.

It is clear that "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate any rights or immunities the association itself may enjoy." *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. at 2211. It is also clear that the requisite injury in fact is not limited to economic harm. *Data Processing, supra,* 397 U.S. at 154, 90 S.Ct. 827. Under these circumstances, then, the Court holds that the hospital association plaintiffs have sufficiently alleged a personal stake in this controversy to insure the concrete adverseness required by Article III. Since they have sufficiently alleged injury in fact,

and since they are arguably within the zone of interests protected by the provider nomination statute, 42 U.S.C. § 1395h(a), they have standing to sue and the Court has jurisdiction to consider the merits of their claim.

The associations' claim that the RFP is without statutory authority is the same as one of the claims asserted by the Blue Cross plaintiffs. The Court will decide that claim on the merits since it has determined that the hospital association plaintiffs have standing to assert that claim. It could be argued then, that the Court need not consider the standing of the Blue Cross plaintiffs at all since a decision on the merits of the hospital association plaintiffs' claim will necessarily decide the merits of the Blue Cross plaintiffs' claim. If all of these entities were plaintiffs in the same lawsuit, the Court would probably be inclined to follow that course of action. However, the Blue Cross plaintiffs filed their action separately, and prior to the filing of the other action. Also, the Blue Cross plaintiffs are challenging the RFP's bid criteria and evaluation procedure as well as contending that the RFP exceeds the Secretary's statutory authority. Complaint of Blue Cross Plaintiffs, Counts II and III. They are entitled to an adjudication of these claims and this entitlement necessitates an examination of their standing.

The government's position is that the RFP is simply a solicitation for a proposal on a fixed price procurement contract and there is no certainty that a contract will be awarded. Thus, the government contends that the Blue Cross plaintiffs will not be injured in fact until and unless a new contract is awarded pursuant to the RFP. The government argues that

---

21. The existing Part A contract between the Secretary and BCA does not expire until September 30, 1979 and, thus, the alleged injury is more threatened than actual at this point. Threatened injury, though, is sufficient for purposes of standing. *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. 2197, *citing Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). In the Court's view, the mere issuance of the RFP so alters the status quo in terms of these plaintiffs' ability to plan

for their future operations that an actual injury exists sufficient to confer standing. However, even if the alleged injury is deemed only threatened and not actual, the Court holds that the alleged injury is sufficiently immediate and real to warrant invocation of federal jurisdiction. *Cf. O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Golden v. Zwickler,* 394 U.S. 103, 109–110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

at this point in time any alleged injury is too speculative to confer standing on these plaintiffs.[22]

■ BCA argues that if it is precluded from performing as a Part A intermediary, and if its member plans are precluded from functioning as intermediary subcontractors, their goodwill and good names will be adversely affected. Complaint, Count I, § 19. The Blue Cross Plans claim injury in fact in that the alleged preclusion will have an adverse impact on their close working relationship with the health care providers in the affected area. BCA also claims injury in fact to the competitive position of its other lines of business in that the alleged preclusion would have the effect of forcing these other lines of business (primarily private coverage) to absorb a larger propor-

tionate share of the expenses attributable to services and facilities, such as the BCA communications network, that are shared by the BCA Medicare Part A business and these other lines of business.[23]

Allegations of actual or threatened damage to a plaintiff's goodwill or good name resulting from governmental action has been recognized as sufficient injury in fact to confer standing to challenge the governmental action. See, *Southern Mutual Health Association v. Califano,* 187 U.S. App.D.C. 307, 312–313, 574 F.2d 518, 523–524 (1977), citing *Joint Anti–Facist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951). See also, *GTE Sylvania, Inc. v. Consumer Products Safety Commission,* 404 F.Supp. 352, 366

**22.** Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 28–29. The government states in its memorandum that ". . . this case will be ripe for judicial review when and if an award of the contract is made." The "ripeness" of a particular claim for adjudication is, of course, a separate concept from the standing of a party to assert the claim, although the concepts are related. See *Warth v. Seldin, supra,* 422 U.S. at 499 n. 10, 95 S.Ct. 2197. The leading cases on this subject are commonly referred to as the *Abbott Laboratories* trilogy; *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). These decisions establish the rule that ripeness is a function of the "fitness" of the case for judicial determination and the hardship that will result if the Court refuses to act. In these cases, the Court is presented with a purely legal issue, *i. e.,* whether the Secretary's authority under the "experimental" statute, 42 U.S.C. § 1395b–1, allows him to disregard the provisions of the "nomination" statute, 42 U.S.C. § 1395h(a). Furthermore, HEW's action regarding the RFP is final in the sense that the RFP has been issued and bids have been submitted. Plaintiffs claim that the RFP itself is in excess of the Secretary's authority under the "experimental" statute. The issue of the extent of the Secretary's authority can be decided without waiting for a contract to be awarded. Thus, following the Supreme Court's admonition that the approach to the finality issue shall be "flexible" and "pragmatic," *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149–150, 87 S.Ct. 1507, the Court holds that the present-

ed claims are fit for review. *Cf. Independent Bankers Assn. of America v. Smith,* 175 U.S. App.D.C. 184, 189–193, 534 F.2d 921, 926–930 (1976); *Environmental Defense Fund, Inc. v. Hardin,* 138 U.S.App.D.C. 391, 396, 428 F.2d 1093, 1098 (1970). Furthermore, withholding a decision until a contract is awarded would work a hardship on all plaintiffs since they would then meet the government's argument that the suit is too late. See *Health Care Service Corp. v. Califano,* CCH Medicare and Medicaid Guide, ¶ 29, 554 (N.D.Ill., Jan. 13, 1979). The Court is of the opinion that withholding a decision would also work a hardship on the government. If this experiment is illegal, it should be enjoined now. Waiting until the government has spent time, effort and money in evaluating bids, awarding a contract, and getting the experiment started before considering the legality of the project does not appear to be in anybody's best interest. In short, adjudication of these cases at this time will not entangle the Court in "abstract disagreements over administrative policies." The decision to issue the RFP in its present format "has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 148–149, 87 S.Ct. at 1515. The cases are ripe for review.

**23.** Blue Cross Plaintiffs' Reply Memorandum, filed May 4, 1979, p. 19; Affidavit of Bernard R. Tresnowski, filed March 28, 1979, ¶ 13. Although these allegations of injury are not in the Blue Cross plaintiffs' original complaint, it is entirely proper for the necessary allegations of injury in fact to be supplied by way of affidavits or by amending the complaint. *Warth v. Seldin, supra,* 422 U.S. at 501–502, 95 S.Ct. 2197.

(D.Del.1975). These allegations, coupled with the other asserted injuries noted above, are enough to meet the injury in fact requirement for standing. Moreover, the Blue Cross plaintiffs, like the hospital association plaintiffs, are faced right now with the likelihood of a change in the status quo that has prevailed from the inception of the Medicare program. The Court holds, as in the case of the hospital association plaintiffs, that this threatened change in the status quo, in alleged violation of statutory rights sufficiently demonstrates a personal stake in the controversy to insure the concrete adverseness required by Article III. The combination of all of these threatened injuries constitutes injury in fact.[24]

The government contends, ·though, that even if there is injury in fact, it is not attributable to the challenged governmental action. In other words, the government contends that there is no causal relationship between any of the Blue Cross plaintiffs' alleged injuries and the government's conduct. The causation element is, of course, an integral part of a plaintiff's standing. *Simon v. Eastern Kentucky Welfare Rights Org., supra,* 426 U.S. at 41–42, 96 S.Ct. 1917.

The government's argument on this issue is based on its contention that all of the Blue Cross plaintiffs were free to submit bids pursuant to the RFP.[25] The government contends that although BCA as presently structured cannot meet the criteria set forth in the RFP for a successful bidder, nothing in the RFP requires the bidder to meet all these criteria at the time the bid is submitted so long as they are met when the contract is ultimately awarded.[26] Thus, the government concludes that any alleged injuries are self-inflicted and flow from BCA's voluntary decision not to bid.[27]

The Court views these arguments as being addressed to the merits of one of BCA's claims and, therefore, irrelevant to the standing question. BCA has alleged that the RFP illegally prohibits subcontracting of the principal intermediary functions. Complaint, Count II, ¶ 24. BCA has alleged that the RFP illegally requires that intermediary functions be physically established and maintained within the affected area. *Id.* ¶ 25. In both of these paragraphs, and in their briefs, the Blue Cross plaintiffs allege and argue that the RFP illegally precludes BCA from submitting a bid.[28] The government's causation argument rests on the assumption that BCA was *not* precluded from bidding but that assumption cannot be made since it is a contested legal issue. Since it is improper to resolve the merits of a claim in analyzing a party's standing,[29] the government's causation argument must be rejected.

The causation element is present in any event. The Blue Cross plaintiffs are challenging the issuance of the RFP, as well as its contents. In contending that the RFP itself violates the provider nomination provisions of 42 U.S.C. § 1395h(a), and in basing the threatened injury that constitutes the injury in fact for these plaintiffs on that alleged statutory violation,[30] the Blue Cross plaintiffs have demonstrated a causal

---

24. See note 21, *supra.*

25. One of the member plan plaintiffs has presumably submitted a bid for the contract. See text at note 8, *supra.*

26. Affidavit of Martin L. Kappert, filed May 21, 1979 as Exhibit A to Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., ¶ 14.

27. The government attributes an anticompetitive motive to BCA's decision not to submit a bid. "The federal defendants submit that BCA declined to bid, not because it was precluded by the RFP, but because it was unwilling to compete against its member plans." Defendants' Memorandum in Support of Their Motion

for Summary Judgment, etc., filed May 21, 1979, p. 31. Other than noting that this speculation is wholly lacking in evidentiary support, the Court will not comment on this issue and deems it irrelevant to the standing question in any event.

28. Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunction, filed March 23, 1979, p. 1, 28–31; Blue Cross Plaintiffs' Reply Memorandum, filed May 4, 1979, p. 21–23.

29. See text at note 16, *supra.*

30. See text at note 24, *supra.*

relationship between the challenged act and the threatened harm. In other words, causation is present because the Blue Cross plaintiffs' injury in fact, the threatened loss of their status under the Medicare program as presently administered, results from conduct which they contend is illegal, the issuance of this RFP.

▮ Since all three Blue Cross plaintiffs satisfy the injury in fact requirement, the only remaining question is whether they are arguably within the zone of interests protected by 42 U.S.C. § 1395h.[31] In answering this question, the Court must keep in mind that "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." *Data Processing, supra,* 397 U.S. at 154, 90 S.Ct. at 830. Furthermore, the Court must examine the statute as a whole, as well as its specific provisions. See *Rodeway Inns of America, Inc. v. Frank,* 541 F.2d 759, 765 (8th Cir. 1976), *citing Barlow v. Collins, supra,* 397 U.S. at 164–165, 90 S.Ct. 832.

▮ The government contends that none of the Blue Cross plaintiffs have protected interests under the provider nomination statute because the statute does not confer a vested contractual right on any of them.[32] While contractual rights might confer standing in some cases, they are certainly not the only method by which a party can demonstrate that its interests are arguably protected by statute. Review of the entire provider nomination statute compels the conclusion that the interests of intermediaries have arguably been given some statutory protection.

▮ Subsection (a) of the statute sets forth the nomination procedure and provides that when a group or association of providers nominates an intermediary, the Secretary is authorized to enter into an agreement with that entity for the purpose of making the payments to the providers. Subsection (b) directs the Secretary to make certain findings to the effect that an agreement with the nominated intermediary, ". . . is consistent with the effective and efficient administration . . ." of the Part A Medicare program.[33] Once the Secretary has received a nomination for an intermediary, that nomination cannot be disregarded unless certain procedural requirements are met. The Secretary, after taking the provider's preferences into account, may assign or reassign any provid-

---

**31.** The government has also argued that the Blue Cross plaintiffs cannot claim standing as unsuccessful bidders since they were free to bid and since no contract has yet been awarded. Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, p. 3, 5–6; Defendants' Memorandum in Support of Their Motion for Summary Judgment, filed May 21, 1979, p. 32–33. As indicated in the text, the question of whether the Blue Cross plaintiffs were free to bid is more properly addressed to the merits rather than to the standing issue.

It is apparent, though, that the government's position is that the only proper time for challenging the RFP and the Secretary's experimental authority is after a contract has been awarded. Under the case law, such an action would clearly be proper. See, *e. g., Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); *Ballerina Pen Company v. Kunzig,* 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970). Anno., Standing of Unsuccessful Bidder for Federal Procurement Contract to Seek Judicial Review of Award, 23 A.L.R.Fed. 301 (1975). Such an action would be brought under the Administrative Procedure Act, 5

U.S.C. §§ 701–706. See note 15, *supra.* An alternative for the unsuccessful bidder would be an action to recover the costs incurred in preparing the bid. Anno., Recovery from the United States of Costs Incurred by Unsuccessful Bidder in Preparing and Submitting Bid in Response to Government Solicitation, 30 A.L.R. Fed. 355 (1976). In view of the Court's holding that these cases are ripe for review, see note 23 *supra,* the Court concludes that a challenge to the Secretary's action in these cases may properly be made before *and* after the award of the contract.

**32.** Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 34. The government also contends that these plaintiffs have no protected interests under the experimental statute, 42 U.S.C. § 1395b–1. The Court agrees with this contention and notes that plaintiffs have not contended otherwise.

**33.** These findings are made by applying standards and criteria which the Secretary is authorized to develop by regulation. 42 U.S.C. § 1395h(f).

er to a different intermediary if that action ". . . would result in the more effective and efficient administration . . ." of the program. 42 U.S.C. § 1395h(e)(1).[34] However, before he makes the assignment or reassignment, he must provide a full explanation of the reasons for his action to the provider and to the intermediary. 42 U.S.C. § 1395h(e)(3)(A)(i). Furthermore, he must furnish the intermediary with a hearing and the final determination made after the hearing is subject to judicial review under the Administrative Procedure Act. 42 U.S.C. § 1395h(e)(3)(A)(ii). Under these statutory provisions, BCA is entitled to retain its status as fiscal intermediary for the hospital association plaintiffs until it is lawfully displaced. Whether or not BCA can be lawfully displaced under the experimental statute, 42 U.S.C. § 1395b–1, is a question addressed to the merits and; therefore, beyond the scope of the Court's inquiry at this point. *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. 827. In view of the procedural safeguards granted to a nominated intermediary, it is at the very least arguable that the interests of BCA are protected by the provider nomination statute.

The same conclusion cannot be reached with respect to the Blue Cross Plans. Their interests in maintaining a contractual relationship with BCA as Part A subcontractors appear uncontemplated by the provider nomination statute. Providers do not nominate the subcontractors and none of the procedural safeguards afforded intermediaries under the statute give any protection to an entity under contract with an intermediary.[35] The relationship between BCA and its member plans is a relationship that is purely contractual insofar as the Part A medicare program is concerned and one which finds no arguable

support or protection in the provider nomination statute.[36] The Court notes that under Part B Medicare, the statute authorizing the Secretary to contract with "carriers" specifically recognizes the existence of subcontractors. 42 U.S.C. § 1395u(a). Thus, even though the Plans have sufficiently demonstrated injury in fact, their standing must be denied since their claim is based on a statute, 42 U.S.C. § 1395h, which does not arguably protect the interests they assert. Accordingly, all claims asserted by Blue Cross of Kansas City and Blue Cross Hospital Services, Inc. of Missouri will be dismissed.

In summary, the Court holds that all hospital association plaintiffs have sufficiently demonstrated injury in fact and their interests are arguably protected by the provider nomination statute. Accordingly, they have standing to challenge the issuance of and the contents of the RFP and the Court will examine the merits of their claim. The Court holds that all Blue Cross plaintiffs have sufficiently demonstrated injury in fact but that only the interests asserted by BCA are arguably protected by the provider nomination statute. Thus, among these plaintiffs, only BCA has standing to challenge the issuance of and the contents of the RFP and the Court will examine the merits of its three claims.

### VI.

With the question of standing resolved, the Court turns to the merits of the asserted claims. The complaint filed by BCA is in three counts. Count I alleges that the RFP is in excess of the Secretary's statutory power. It further alleges that the RFP is ". . . illegal in that it seeks to award a Medicare Part A intermediary con-

34. Subsection (e) was added to 42 U.S.C. § 1395h by the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub.L. 95–142, 91 Stat. 1198.

35. The Court notes that in responding to the government's standing contentions, plaintiffs have never specifically contended that the zone of interests arguably protected by 42 U.S.C. § 1395h includes the Blue Cross plans. Reply

Memorandum of the Blue Cross Plaintiffs, filed May 4, 1979, p. 19–20; Plaintiffs' Supplemental Memorandum, filed May 26, 1979, p. 13–14.

36. The rights and obligations of the Plans are illustrated by the form of Agreement filed as Exhibit 1 to Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, at p. 13–14.

tract in the absence of the statutorily required nomination of the intermediary by a group or association of providers which is the only manner authorized by statute, and deprives providers of their statutory right to choose their intermediaries." [37] This claim is the sole claim asserted by the hospital association plaintiffs and AHA, the intervenor-plaintiff. Count II of BCA's complaint alleges that the RFP's provisions (1) requiring that all intermediary functions (other than data processing) be physically established and maintained within the affected area and (2) prohibiting subcontracting of principal intermediary functions are arbitrary and have no rational basis. These provisions are alleged to preclude BCA from bidding under the RFP in violation of federal procurement law and the Due Process Clause of the Fifth Amendment to the United States Constitution. Count III of BCA's complaint alleges that the RFP is illegal in that the criteria for evaluating the past experience of offerors discriminates against entities which have Medicare experience, in violation of federal procurement law and the due process clause.

## VII.

■ As previously noted, the Secretary's authority is being claimed under the "experimental" statute, 42 U.S.C. § 1395b–1. This provision was enacted as a part of the Social Security Amendments of 1972.[38] This statute gives the Secretary the authority to conduct certain experiments relating to the administration of the Medicare program (Part A and Part B), the Medicaid program, and the Maternal and Child Health and Crippled Children Services program. This experimental authority includes the power to conduct an experiment with a fixed price contract to determine whether such a method of contracting might induce more efficient and economical performance by ". . . agencies and organizations making payment under agreements or contracts with the Secretary

. . . ." 42 U.S.C. § 1395b–1(a)(1)(F). The legal question presented by the claims of the hospital association plaintiffs and Count I of BCA's complaint is whether the experimental authority conferred upon the Secretary by this statute authorizes noncompliance with the provider nomination provisions of 42 U.S.C. § 1395h. Although the question is admittedly close, the Court has concluded that such noncompliance is not authorized by the experimental statute. This conclusion is based on the Court's holdings that (1) the experimental statute does not expressly or impliedly authorize noncompliance with provider nomination procedures; (2) the experimental statute does not mandate competitive bidding in connection with the proposed experiment; and (3) the proposed experiment and the hypothesis it proposes to test can be conducted within the provider nomination framework.

■ The meaning of a statute must be ascertained from the language used by Congress. If the meaning is plain, the law must be enforced as written. See *United States v. Kelly,* 519 F.2d 251, 256 (8th Cir. 1975), *citing Helvering v. Hammel,* 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303 (1941); *United States v. Standard Brewery,* 251 U.S. 210, 217, 40 S.Ct. 139, 64 L.Ed. 229 (1920). See also, *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). The Secretary contends that the language of the experimental statute clearly authorizes noncompliance with the provider nomination statute in that it gives the Secretary authority to enter into ". . . contracts with public or private agencies, institutions, and organizations . . . ." The contention is that because the term "nominated intermediary," or words of similar import, were not included, the intent must have been to authorize a contract with any entity deemed appropriate by the Secretary.[39] The quoted language, though, prefaces a list of ten subsections, each of which authorizes a particular

---

**37.** Complaint, Count I, ¶ 16.

**38.** Pub.L.92–603, 86 Stat. 1391, 1453.

**39.** Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 5.

kind of experiment or demonstration project. Since the experimental statute authorizes these endeavors in connection with four entirely separate programs (Medicare Part A, Medicare Part B, Medicaid, Maternal and Child Health), the Court believes that the language authorizing contracts with generically described entities was employed in recognition of the diverse entities that participate in these four programs. It would not have made sense to include "nominated intermediaries" or similar words in this listing since such an entity exists under only one of the four programs.

■ The most that can be concluded with certainty from this statutory listing of entities with whom the Secretary may contract is that the meaning is not plain and that it is unclear whether Congress intended to grant the Secretary authority to ignore the provider nomination of provisions of 42 U.S.C. § 1395h. Subsection (b) of the experimental statute specifically authorizes the Secretary to ignore statutory provisions in the relevant programs ". . . insofar as such [provisions] relate to reimbursement or payment on the basis of reasonable cost or . . . reasonable charge . . . ." 42 U.S.C. § 1395b–1(b). All plaintiffs contend that these "waiver" provisions are exclusive and that by authorizing the Secretary to waive compliance with these provisions, Congress intended that the Secretary comply with all other statutory provisions.[40]

■ The Court does not believe that the waiver provisions of 42 U.S.C. § 1395b–

1(b) are exclusive and agrees with both sides that the Secretary need not comply with statutory requirements that are clearly inconsistent with the proper exercise of his experimental authority.[41] However, the waiver provisions of the experimental statute are not irrelevant because the form in which they were drafted, when compared to the form of waiver provisions in other statutes, sheds some light on the congressional intent behind the grant of experimental authority.

■ Congress knows how to draft statutes in the health care field which authorize experiments and grant the Secretary broad authority to waive compliance with otherwise applicable statutory provisions. The Secretary has been granted authority to conduct experiments and demonstration projects in connection with approved state plans under the public assistance titles of the Social Security Act under the provisions of 42 U.S.C. § 1315 which, in pertinent part, provides:

> (a) In the case of an experimental, pilot, or demonstration project which, *in the judgment of the Secretary,* is likely to assist in promoting the objectives of subchapter I, VI, X, XIV, XVI, XIX, or XX of this chapter, or Part A of subchapter IV of this chapter [AFDC], in a State or States—

> (1) The Secretary may waive compliance with any of the requirements of section 302, 602, 802, 1202, 1352, 1382,

---

**40.** Plaintiffs appear to concede that a statute clearly inconsistent with the Secretary's experimental authority need not be followed. Thus, in plaintiffs' view, the provisions of 42 U.S.C. § 1395h(c), relating to payments of administration costs to intermediaries under contract with the Secretary, while not expressly waived by 42 U.S.C. § 1395b–1(b), are inconsistent with the concept of a fixed price contract and need not be followed in an experiment under the latter statute. Reply Memorandum of Blue Cross Plaintiffs, filed May 4, 1979, p. 16.

**41.** In so holding, the Court rejects the application of *expressio unius est exclusio alterius* which has been argued throughout plaintiffs' briefs. The maxim is certainly not a rule of law. *Potomac Passengers Assn. v. Chesapeake & Ohio Ry. Co.,* 154 U.S.App.D.C. 214, 220–

221, 475 F.2d 325, 331–332 (1973). Further, the Court has concluded that Congress granted the Secretary experimental authority to waive compliance with statutes inconsistent with that authority. Application of the maxim would be inconsistent with that holding.

The Court also rejects the Secretary's argument that the waiver provisions are not a limitation on his experimental authority. The contention that subsection (b) of the statute does not limit the authority granted under subsection (a) is belied by the introductory language of the waiver provisions: "In the case of *any* experiment or demonstration project *under subsection (a) of this section,* the Secretary may waive compliance with . . . ." (Emphasis added.)

1396a, 1397a, 1397b, or 1397c of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project . . .." (Emphasis added.)

Although this statute has been amended several times since it was enacted, the broad waiver provisions have remained virtually unchanged. It was on the books when Congress enacted 42 U.S.C. § 1395b–1 in 1972. It is true that the statute quoted above refers to the Secretary waiving compliance by the states while the experimental statute in question here refers to the Secretary waiving compliance by HEW. Regardless, though, of whether it is HEW or a particular state conducting the experiment, the point is that in one experimental statute Congress specifically delineated broad waivers while in the other the waivers are comparatively narrow. Furthermore, 42 U.S.C. § 1315 authorizes *any* experiment ". . . likely to assist in promoting the objectives . . ." of the relevant programs while 42 U.S.C. § 1395b–1 specifically defines the experiments permitted under its authority. The Court concludes from these distinctions that the Secretary's authority is much narrower under 42 U.S.C. § 1395b–1 than it is under 42 U.S.C. § 1315.

This conclusion is consistent with recent action taken in the Congress. A bill was introduced on June 14, 1979 by Representatives Rangel and Waxman entitled "Medicare and Medicaid Amendments of 1979," H.R. 4475. A letter from Secretary Califano to Speaker O'Neill dated June 14, 1979, enclosing a copy of the draft bill, urges Congress' "prompt and favorable consideration" of the draft bill.[42] Among the bill's various provisions are proposed amendments to 42 U.S.C. § 1395b–1 which would authorize the Secretary to ". . . waive compliance with *any of the requirements* of titles XVIII [Medicare], XIX and V of the Social Security Act, to the extent

and for the period he finds necessary to conduct such experiment. . . ." (Emphasis added.) This broad language is in marked contrast to the statute's present language and is similar to the language used in 42 U.S.C. § 1315. The Court's conclusion, then, that the Congress that enacted the present statute intended to more narrowly limit the Secretary's power to waive compliance with other statutes appears sound. Accordingly, noncompliance with an otherwise applicable statute, such as the nomination provisions of 42 U.S.C. § 1395h, is authorized under present law only if absolutely necessary to conduct an experiment authorized by 42 U.S.C. § 1395b–1.

The Secretary's position on this issue appears to be that the nomination procedures are fundamentally inconsistent with the concept of fixed price contracting and that engendering "full and free" competition is an inherent aspect of his authority to experiment.[43] However, there is no language in the experimental statute which specifically mandates the use of competitive bidding procedures when experimenting with a fixed price contract under 42 U.S.C. § 1395b–1(a)(1)(F). The statute simply does not address the question of *how* a particular experimental fixed price contract is to be awarded.

Federal procurement law provides for competitive bidding in government contracting unless that process is made inapplicable by some other provision of law. 41 U.S.C. § 252(a)(2). However, the strict competitive bidding procedures are not applicable when ". . . the agency head determines that the purchase or contract is for experimental, developmental, or research work . . .." 41 U.S.C. § 252(c)(11); 41 C.F.R. § 1–3.211. In that situation, the statutes and regulations authorize a "negotiated procurement." This

---

**42.** The letter and the draft bill have been filed with the Court as exhibits to Blue Cross Plaintiffs' Supplemental Memorandum, filed June 25, 1979. Defendants sought and were granted leave to respond to this Supplemental Memorandum. Their response was filed June 28.

**43.** Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, pp. 15–18; Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, pp. 12–17.

process involves soliciting bids through a request for proposal, 41 C.F.R. § 1–3.802(b), and then negotiating the final contract. Prior to the negotiation, though, the contracting officer has received advice regarding price from experts in the relevant field, 41 C.F.R. § 1–3.801–2(b), and from a team of "pricing experts," 41 C.F.R. § 1–3.801–3(b). This input from "team members" is aimed at developing ". . . an estimate of the proper price level . . ." for the contract to be negotiated. 41 C.F.R. § 1–3.802(a). It is this type of "negotiated procurement" that is contemplated by the RFP at issue in this case.[44] Thus, consideration of the alleged need for competitive bidding must recognize the true nature of the proposed procurement.

Plaintiffs dispute the necessity for competitive bids and have suggested methods by which the Secretary could test a fixed price approach to contract administration within the provider nomination framework. Two of their suggestions are non-competitive and the third contemplates competing bids from nominated intermediaries.[45] These proposals must be evaluated to determine whether the two statutes are capable of being harmonized and given full effect. The Secretary argues that the Court should not consider such proposals because to do so would be an improper substitution of the Court's judgment for that of the Secretary.[46]

That argument misses the point. The Court does not intend to substitute its judgment for the Secretary's as to how to conduct an experiment. However, it is a fundamental rule of statutory construction that courts should attempt to give effect to all provisions of congressional enactments, particularly where two statutes apply to the situation at hand. See *Rawls v. United States*, 331 F.2d 21, 28 (8th Cir. 1964), *citing United States v. Borden Company*, 308 U.S. 188, 198–199, 60 S.Ct. 182, 84 L.Ed. 181 (1939). See also, *Burrow v. Finch*, 431 F.2d 486, 492 (8th Cir. 1970, *citing with approval Kandelin v. Kandelin*, 45 F.Supp. 341 (E.D. N.Y.1942); *aff'd sub nom. Kandelin v. Social Security Board*, 136 F.2d 327 (2d Cir. 1943), which held, *inter alia*, that provisions of the Social Security Act must be construed together if possible.[47] The Court must assume that Congress was aware of the provider nomination provisions when it enacted the experimental statute in 1972. Accordingly, the experimental statute must be read in conjunction with the law that existed at the time of its enactment. *Kansas City, Missouri v. Federal Pacific Electric Co.*, 310 F.2d 271, 275 (8th Cir. 1962), *cert. den.* 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962), *reh. den.* 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 415 (1963). See also, *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955). Plaintiffs' suggested rationalizations of the two statutes and the Secre-

44. Kappert Affidavit, ¶ 2, attached as Exhibit A to Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979.

45. Reply Memorandum of Blue Cross Plaintiffs, filed May 4, 1979, pp. 10–12. Plaintiffs' suggestions also deal with "performance incentive contracts" and they offer three similar proposals regarding these contracts.

46. Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 17.

47. In the *Kandelin* case, the Second Circuit addressed the argument continually urged by defendants in this case to the effect that the Secretary's interpretation of the experimental statute is entitled to great weight and deference:

> Apparently this result imposes serious practical difficulties of administration, as we can well understand; and the Board has from the outset construed subdivision m as it wishes us to do now. That interpretation is of course entitled to great weight, but in the end we bear the responsibility of reaching an independent decision, unless we are altogether to abdicate. If the necessity of deciding such issues too greatly impedes the administration of the act, Congress alone can give relief, though we would doubt whether it would be disposed to do so. *Kandelin v. Social Security Board, supra* at 328–329.

tary's contentions regarding the necessity of competitive bidding must be evaluated in light of these principles.

Plaintiffs suggest that since there is no competitive bidding provision in the experimental statute, the Secretary could attempt to negotiate a fixed price Part A contract with any nominated intermediary. There are at least three nominated intermediaries functioning in the area affected by the RFP.[48] If an "acceptable" fixed price could not be negotiated with that nominee, the Secretary, using his authority under 42 U.S.C. § 1395h(b), could find that contracting with that nominee would be inconsistent ". . . with the effective and efficient administration . . ." of Part A and decline to award the contract. He could then proceed to negotiate with and possibly award the experimental contract to another nominee. Should negotiations with this entity fail, he would proceed to the next nominee and so on until all nominees in the affected area have been given the opportunity to negotiate for the experimental contract. If a satisfactory fixed price contract could not be agreed upon, the Secretary would have the authority to enter into such a contract with some other entity, with or without the use of competitive bidding, and to ". . . assign or reassign any provider of services to [that] agency or organization . . . ." 42 U.S.C. § 1395h(e)(1). Plaintiffs also suggest that if the Secretary insists on soliciting "competitive" bids in the first instance he could limit eligible bidders to all existing nominees.[49] The Secretary could award the ex-

perimental contract to that entity and assign or reassign providers using his authority under 42 U.S.C. § 1395h(e)(1). Under any of these proposals, any assignment or reassignment would be subject to the procedural safeguards set forth in 42 U.S.C. § 1395h(e)(2) and (3).

The Secretary's primary response to these suggestions is the contention that he cannot obtain truly "experimental" price data without open competition. He states that ". . . open competition is the only method under which incentives would exist to produce a 'best offer' which could be identified. . . ."[50] These contentions ignore the fact that this RFP contemplates a "negotiated procurement" and not truly "open competition."[51] This procurement approach means that the Secretary already has ". . . an estimate of the proper price level . . ." for the contract. 41 C.F.R. § 1–3.802(a). He also has the cost history of the Medicare program and the history of administration costs incurred by every intermediary under prior contracts. There is simply no merit to the argument that the Secretary is unable to determine what is or is not an acceptable fixed price for this experimental contract. This is not a contract for fungible goods where bidding might produce a significant disparity in price. Rather, this is a contract for highly specialized, complex administrative services and the Secretary is in the most advantageous position possible for recognizing an acceptable price level for these services.

---

**48.** See text at note 4, *supra.* See also, Affidavit of Dean R. Mordy, ¶ 7, filed in connection with Defendant's Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979.

**49.** This suggestion is somewhat qualified in view of BCA's contention that the instant RFP illegally bars it from bidding on the contract. That contention presents an altogether separate question and is discussed below. See Part VIII, *infra.*

**50.** Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, pp. 15–16. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, filed April 19, 1979, p.

17. The Secretary also argues that compliance with the reassignment provisions of 42 U.S.C. § 1395h(e) ". . . would place an undue burden on the Secretary in conducting the experiment." *Id.* at p. 17, n. 6. Defendants have provided no evidentiary support for this contention and the Court deems it without merit in any event. Moreover, in arguing that the nomination process is not sacrosanct, the Secretary points out that nominations are frequently and easily rejected. Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 20.

**51.** See text at note 45, *supra.*

Furthermore, all parties agree that the provider nomination provisions will remain in full effect in areas unaffected by the RFP and that, assuming the experiment is not enjoined, these provisions will continue to apply to intermediary contracts in the affected area at the conclusion of the experiment. This obvious fact is very important because the experimental statute authorizes an experiment to ascertain whether the use of a fixed price approach to contract administration ". . . would have the effect of inducing to the greatest degree effective, efficient, and economical performance of *agencies and organizations making payment under agreements or contracts with the Secretary . . . .*" (Emphasis added.) 42 U.S.C. § 1395b–1(a)(1)(F). In the context of this case, these "agencies and organizations" are the nominated intermediaries. If the authorized purpose of the experiment was to find the *lowest possible price at which an entity* could perform principal intermediary functions, it would be logical to solicit bids from *any entity* capable of adequate performance. Congress has not, however, authorized the Secretary to experiment to determine which agency or organization is capable of performing intermediary functions at the lowest possible cost. Nor has Congress authorized experiments to determine whether agencies other than BCA can perform in a less costly manner, as the Secretary appears to contend.[52] The statute authorizes experiments to determine whether a fixed price approach to contract administration might induce more efficient and economical performance by "agencies and organizations making payment under agreements or contracts with the Secretary;" *i. e.,* nominated intermediaries. 42 U.S.C. § 1395b–1(a)(1)(F).

**52.** Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, pp. 22, 31.

**53.** The Secretary has argued that because this experiment is to be limited in time and geographic application, the provider nomination statute has not been illegally disregarded. Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, pp. 10, 18. This argument has

The Court holds that the experimental statute does not authorize noncompliance with the nomination statute. Since the nomination statute will govern Part A contracts at the conclusion of the experiment, it is logical to attempt in the first instance to experiment with the agencies and organizations that are capable of being awarded a contract in the future.[53] An intermediary's performance under a fixed price ceiling can be readily and meaningfully compared against past performance under the cost reimbursement provisions of 42 U.S.C. § 1395h(c).

Only if the Secretary is unable to negotiate a satisfactory contract with a nominee in the first instance will he be free to solicit offers, with or without competitive bidding, from non-nominated entities. The Secretary will be free to choose the order of negotiations among the nominees but all must be given the opportunity to negotiate this contract for this area. Negotiations with nominees in the affected area may be undertaken simultaneously or individually or bids may be solicited from all nominees in the affected area. Regardless of the identity of the entity which is ultimately awarded the contract, the Secretary must follow the procedures set forth in 42 U.S.C. § 1395h(e) to effectuate reassignment or assignment of providers to the new contractor if that contractor is not the nominee of the affected providers.

This approach will give full effect, to the maximum extent possible, to the provisions of both the experimental and provider nomination statutes. It is a logical approach which, in the absence of persuasive legislative history to the contrary, takes into account the comparatively narrow experimental authority granted under

some force but the Court has concluded that it is not logically sound. The Court has held that the experimental statute does not authorize the Secretary to waive compliance with the nomination statute. If the experimental statute simply does not authorize such noncompliance, it makes no difference that the noncompliance would only be for a limited time in a specific area.

42 U.S.C. § 1395b–1 and recognizes practical limitations on that authority. The Court must assume that Congress contemplated a logical approach to experimentation under 42 U.S.C. § 1395b–1. To the extent that the experiment to be conducted under this RFP fails to recognize the applicability of the provider nomination provisions of 42 U.S.C. § 1395h, it is in excess of statutory authority and will be enjoined.

### VIII.

The RFP requires the experimental contractor to directly perform most of the principal intermediary functions set forth in 42 U.S.C. § 1395h(a). This requirement effectively prohibits the subcontracting that is currently used by BCA in the performance of its Part A contracts. The RFP also requires the experimental contractor to physically establish and maintain all intermediary functions, other than data processing, within the area affected by the experiment.[54] These requirements preclude BCA, as it presently operates, from being awarded the experimental contract. Count II of BCA's complaint alleges that these requirements have no rational relationship to the authorized objectives of this experiment and that they discriminate against BCA in violation of the Due Process Clause of the Fifth Amendment.[55] The contention is that because BCA has extensive experience as a Part A prime contractor, it is arbitrary and irrational to preclude it from attempting to obtain the award of the experimental contract.

Discrimination is generally attacked under the Equal Protection Clause of the Fourteenth Amendment. That constitutional provision applies to the states and not to the federal government. The Supreme Court has long recognized, however, that the Due Process Clause of the Fifth Amendment contains an equal protection standard because ". . . discrimination may be so unjustifiable as to be violative of due process. [Footnote omitted.]" *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). See also, *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1975). The case law developed under this doctrine holds that a classification among entities in the area of economics or social welfare is constitutionally valid if it is rationally related to a legitimate governmental purpose. *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1972) (collecting cases). *Cf. Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971).

■ The RFP was issued under 42 U.S.C. § 1395b–1(a)(1)(F) which generally gives the Secretary authority to experiment to determine whether the use of a fixed price contract would induce more efficient performance by Part A intermediaries. The criteria and requirements utilized in the experiment must be rationally related to the purpose of the experiment. In other words, when conducting an experiment under this statute, the Secretary must not discriminate among potential contractors on the basis of criteria which bear no rational relation to the experiment's statutory purpose. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1974).

The Secretary states that requiring the experimental contractor to physically establish and maintain the principal intermediary functions in the affected area is necessary

---

**54.** See text at notes 6–7, *supra.*

**55.** BCA also contends that these requirements violate the policies embodied in federal procurement law which seek to promote competition among all possible contractors. The government is critical of the apparent inconsistency between BCA arguing on the one hand that the contract should be let on a noncompetitive basis and arguing on the other hand that the RFP criteria stifle open competition. Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, pp. 16, 23–24. The two positions are logically inconsistent but this is permitted under the federal rules. Rule 8(e)(2), Fed.R.Civ.P. Since the Court has held that any experiment under 42 U.S.C. § 1395b–1(a)(1)(F) must recognize the applicability of the provider nomination statute which makes general procurement law inapplicable, it is unnecessary to consider whether this RFP violates any specific provisions of that body of law.

for efficient monitoring of the experiment. The Kansas City Regional Office of the Health Care Financing Administration will have primary responsibility for monitoring the experimental contractor's performance. The Secretary believes that in order to assess the true impact of fixed price contracting, regular monitoring of the contractor by HEW is necessary. The requirement of geographic proximity to the Kansas City Regional Office is intended to facilitate this need for performance monitoring. The Secretary also wants the experimental contractor to be a "strong presence" in the affected area.[56]

 BCA contends that in this day and age of telecommunication and easy travel, the argument that effective monitoring requires geographic proximity is "preposterous."[57] While there is some force to this contention, the Court is unwilling to hold that the Secretary's justifications for this requirement are wholly irrational. Inherent in the Secretary's authority to experiment is the authority to evaluate the results of the experiment. If the evaluation process requires regular monitoring of the experimental contractor, the Secretary must have the authority to carry out this function in an administratively efficient manner. In short, the Court holds that the requirement that the experimental contractor physically establish and maintain the principal intermediary functions in the affected area is rationally related to an experimental purpose authorized by 42 U.S.C. § 1395b–1(a)(1)(F).[58]

 The Court has reached the same conclusion with respect to the RFP's requirement that most of the principal intermediary functions be directly performed by the experimental contractor. The RFP would allow subcontracting only for provider audits, data processing services and automated desk reviews. The Secretary believes that there are existing, well-established techniques for evaluating the efficiency of these services. The other functions performed by an intermediary do not, in the Secretary's judgment, have such established performance evaluation techniques.[59] Because of this state of the art, the Secretary believes that the reasons for success or failure in any of the principal intermediary functions are difficult to assess. The direct performance requirement is intended to eliminate the variable of subcontractor performance from the process of evaluating the experimental contractor's performance under a fixed price contract. This requirement is rationally related to an experimental purpose authorized by 42 U.S.C. § 1395b–1(a)(1)(F).

The RFP sets out these requirements in general form and they apply equally to all potential experimental contractors. They are not directed specifically at BCA. Furthermore, *potential* contractors need not meet all of the criteria to be eligible for the award. A potential contractor simply has to *agree* to establish its facilities in the affected area and it may make the necessary arrangements for direct performance at any time prior to the experimental contract actually being awarded.[60] Thus, BCA has the same opportunity as any other potential contractor to obtain the award of this experimental contract. Equal opportunity is all that the Due Process Clause requires in this context. *Duke City Lumber*

56. Defendants' Memorandum in Opposition to Plaintiffs' Motions for Preliminary Injunction, filed April 19, 1979, p. 21; Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 25.

57. Blue Cross Plaintiffs' Reply Memorandum, filed May 4, 1979, p. 22.

58. This requirement does not discriminate against BCA. None of the nine national intermediary prime contractors for Medicare Part A currently maintain either an office or staff within the affected area. Affidavit of Dean R.

Mordy, filed May 21, 1979 in connection with Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., ¶ 11.

59. Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., filed May 21, 1979, p. 26.

60. Affidavit of Martin L. Kappert, filed May 21, 1979, as Exhibit A to Defendants' Memorandum in Support of Their Motion for Summary Judgment, etc., ¶ 14; RFP, p. 5.

*Co. v. Butz,* 382 F.Supp. 362, 375 (D.D.C. 1974), *aff'd per curiam* 176 U.S.App.D.C. 218, 539 F.2d 220 (1976), *cert. den.* 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Accordingly, all relief requested by BCA under Count II of its complaint will be denied.

### IX.

■ Under the provisions of this RFP, the prior experience of bidders for the experimental contract is to be evaluated in different ways, depending primarily on the type of prior experience.[61] Count III of BCA's complaint alleges that this methodology arbitrarily discriminates against entities like BCA that have prior experience administering Medicare Part A programs. Since the experience of these entities is to be evaluated with reference to Annual Contractor Evaluation Reports, while the experience of other bidders is to be evaluated with reference to either Best's Insurance Reports or interview results, BCA contends that the methodology gives an unfair advantage to bidders without Medicare experience. This contention is based on the argument that because the ACER is a much more rigorous evaluation, experienced offerors will obtain the lowest experience score. BCA contends that this result is irrational and violates the Due Process Clause of the Fifth Amendment.[62] BCA's position is that all bids should be evaluated on the same basis.

It should be noted at the outset that this claim relates solely to the method of evaluating competitive bids. However, as explained in Part VII, *supra,* the Secretary will be enjoined from awarding this experimental contract on the basis of competitive bids until he has attempted to negotiate a contract with every intermediary nominated by associations representing providers in the affected area. Accordingly, questions regarding the methodology used to evaluate competitive bids submitted by both nominated and non-nominated entities may never arise. The Court will resolve the claim, though, in case such questions do in fact arise.

The experience factor represents 25% of the total points assigned to each competing bid. This factor is made up of four components representing the type of experience, the length of experience, the volume of claims and the quality of the experience. Length and volume are straightforward evaluations and there is no dispute on these items. Past Medicare experience is rated higher than other experience and, consequently, BCA and other Part A contractors have an advantage on that component.[63] The dispute here concerns the quality component.

The Secretary argues that he must use the ACER to evaluate an offeror's past Medicare experience that is the best information available. In order to obtain the best available information on offerors without Medicare experience, continues the Secretary, he must employ other means. For insurance company offerors, Best's Insurance Reports will be used insofar as they are relevant. If more information is needed, and for non-insurance company offerors, the Secretary intends to employ an interview technique that is widely used in government procurement.[64] Interviewees are randomly selected from a list of references supplied with each bid. They are contacted and interviewed from a preestablished questionnaire which is designed to obtain information comparable to that obtained from an ACER. This, in the Secretary's judgment, is the best possible

---

**61.** See text at notes 9–12, *supra.*

**62.** The standards for analyzing this due process challenge are the same as those used in analyzing BCA's contentions under Count II. See text following note 55, *supra.* BCA also contends that the methodology violates federal procurement regulations and the Court's remarks concerning that contention under Count

II are equally applicable here. See note 58, *supra.*

**63.** Affidavit of Martin L. Kappert, filed May 21, 1979 in connection with Defendants' Memorandum in Support of Their Motion for Summary Judgment, ¶ 17.

**64.** *Id.,* ¶ 18.

means of evaluating the experience of diverse organizations.

The Court holds that this methodology is reasonably calculated to give the Secretary a basis for making a rational judgment. The methodology is designed to elicit information that is roughly comparable in the absence of exactly comparable information. It is a consistent policy designed to obtain the best available information on all offerors.

As previously indicated, competitive bidding will be used only in the event that the Secretary is unable to negotiate a satisfactory fixed price experimental contract with a nominee. In the event that the bidding process is ultimately employed, evaluation of each offeror's experience on the basis set forth in this RFP will be consistent with considerations of due process. BCA's contentions regarding discrimination assume that use of this methodology will result in the least experienced offerors obtaining the highest experience scores. There is no evidence in the record to warrant or support this assumption. Accordingly, all relief sought by BCA under Count III of its complaint will be denied.

## X.

Plaintiffs have requested declaratory and injunctive relief. These remedies must be considered separately. *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 121, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1973). The Court has concluded that both forms of relief are warranted under the circumstances of this case.

For a litigant to be entitled to a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, there must be ". . . a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Super Tire Engineering Co. v. McCorkle, supra* at 122, 94 S.Ct. at 1698, *citing Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85

L.Ed. 826 (1941). This test parallels the standing inquiry [65] since both Article III and the Declaratory Judgment Act require the existence of a case or controversy. *Steffel v. Thompson*, 415 U.S. 452, 458, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1973). The Court believes that it is apparent that the *Super Tire* standard quoted above is met in this case. The parties are certainly adverse. The experimental contract is to be awarded under the terms of this RFP on July 2, 1979. The interpretation and construction of the experimental and nomination statutes presents a substantial legal question. Accordingly, the Court holds that this is an appropriate case for a declaratory judgment.

The traditional basis for entitlement to injunctive relief in the federal courts in irreparable harm and an inadequate legal remedy. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 3 L.Ed. 988 (1958). On the question of a legal remedy, the Court must consider whether a declaratory judgment is adequate. *Id.* at 509, 79 S.Ct. 948. If it is not, the Court must consider the question of whether irreparable injury will result if the injunction is denied. *Id.* at 510, 79 S.Ct. 948.

The Court has concluded that a declaration of the parties' respective rights will not be an adequate legal remedy since a declaratory judgment will not necessarily prevent the experimental contract from being awarded. Accordingly, the irreparable injury question must be considered. Since it is this element which distinguishes the two remedies, it is generally given a more stringent examination. See, *e. g., Diaz v. Stathis*, 576 F.2d 9, 11 (1st Cir. 1978), *citing Steffel v. Thompson, supra*, 415 U.S. at 466–473, 94 S.Ct. 1209. However, in considering this element, the fact that the injunction will simply prevent violation of a federal statute must be given great weight. See, *United States v. City and County of San Francisco*, 310 U.S. 16, 30–31, 60 S.Ct. 749, 84 L.Ed. 1050 (1940).

---

**65.** See text at note 13, *supra*.

■ Without an injunction, BCA will unlawfully be prohibited from functioning as a Part A intermediary in the area affected by this RFP. Without an injunction, the hospital association plaintiffs will unlawfully be deprived of their statutory nomination rights. Defendants' proposed violation of the provider nomination statute, 42 U.S.C. § 1395h, warrants holding that these plaintiffs will suffer irreparable injury unless injunctive relief is granted.[66] Injunctive relief is appropriate at this time because it will prevent the expenditure of time and effort on a project which is in excess of statutory authority [67] and which, as presently structured, violates the specific provisions of the nomination statute. *Cf. Borden, Inc. v. Federal Trade Commission*, 495 F.2d 785, 787 (7th Cir. 1974).

The form and scope of this injunction will comply with the provisions of Rule 65(d), Fed.R.Civ.P. It will be narrowly framed so that it does not go beyond remedying the specific harm claimed by plaintiffs and redressing what the Court has held illegal. *Graves v. Romney*, 502 F.2d 1062, 1064 (8th Cir. 1974) *cert. den. sub. nom. Graves v. Lynn*, 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 440 (1975). See also *Cason v. United States*, 381 F.Supp. 1362, 1368 (W.D.Mo. 1974), *aff'd sub. nom. Summers v. United States*, 510 F.2d 123 (8th Cir. 1975). *Cf. Hartford-Empire Co. v. United States*, 323 U.S. 386, 409–410, 65 S.Ct. 373, 89 L.Ed. 322 (1944). In view of the foregoing discussion, it is

ORDERED that all claims asserted by Blue Cross of Kansas City and Blue Cross Hospital Services, Inc. of Missouri be, and hereby are, dismissed; and it is

ORDERED that the motions for summary judgment filed by the Missouri Hospital Association, the Kansas City Area Hospital Association, the Hospital Association of Metropolitan St. Louis, the Kansas Hospital Association and the American Hospital Association be, and hereby are, granted; and it is

ORDERED that the motion for summary judgment filed by the Blue Cross Association be, and hereby is, granted as to Count I of its complaint and denied as to Counts II and III of its complaint; and it is

ORDERED that defendants' motion for summary judgment be, and hereby is, granted as to Counts II and III of the Complaint filed by the Blue Cross Association and denied in all other respects; and it is

ORDERED AND DECLARED that (1) insofar as the Request for Proposal issued by defendants and dated January 31, 1979 fails to recognize the applicability of 42 U.S.C. § 1395h, it is in excess of defendants' authority under 42 U.S.C. § 1395b–1(a)(1)(F); (2) the provisions of this Request for Proposal which require the experimental contractor to physically establish and maintain all principal intermediary functions, other than data processing, within the affected area and the provisions which require the experimental contractor to directly perform all principal intermediary functions, other than provider audits, data processing support services and automated desk reviews, do not violate the due process rights of the Blue Cross Association; and (3) the provisions of this Request for proposal pertaining to evaluation of the experience of potential experimental contractors do not violate the due process rights of the Blue Cross Association; and it is

ORDERED, ADJUDGED AND DECREED that defendants, their employees and successors in office, be, and hereby are, permanently enjoined and restrained from executing an experimental, fixed price Medicare Part A Intermediary Contract for the State of Missouri and the metropolitan Kansas City area (as defined in this Request for Proposal) under the competitive

---

**66.** BCA has also contended that the injuries which give it standing, see text at notes 22–24, *supra*, sufficiently demonstrate the likelihood of irreparable injury. Affidavit of Bernard R. Tresnowski, filed March 28, 1979, ¶ 13. This contention need not be considered in view of the Court's holding that the proposed violation of a federal statute by a federal agency satisfies the irreparable injury test in this case.

**67.** See note 22, *supra*.

bidding procedures set forth in (and incorporated by reference into) the Request for Proposal, dated January 31, 1979 until defendants have attempted, in good faith, to negotiate such a contract with every intermediary nominated by associations representing providers in the affected area (as defined in this Request for Proposal). In lieu of, or in addition to, such negotiation, defendants may solicit competing offers from every intermediary nominated by associations representing providers in the affected area. Defendants may solicit offers in the manner set forth in this Request for Proposal if but only if they are unable, after good faith effort, to obtain a satisfactory fixed price experimental contract in the manner set forth in this injunction. Regardless of the entity ultimately awarded this contract, defendants must follow the procedures set forth in 42 U.S.C. § 1395h(e) to effectuate reassignment or assignment of providers to the experimental contractor if that contractor is not the nominee of the affected providers.