Linus WAMPLER; Katherine E. Tintor; Judith A. Obeidginski; Frederick M. Salo; United Steelworkers of America; Bridge, Structural and Ornamental Iron-workers Local 563, AFL–CIO;. the Minnesota AFL–CIO; Armco, Inc.; Bethlehem Steel Corporation; Inland Steel Company; Jones & Laughlin Steel Corporation; Republic Steel Company; and United States Steel Corporation, Plaintiffs,

v.

Neil GOLDSCHMIDT, Secretary of U. S. Dept. of Transportation; Karl S. Bowers, Federal Highway Administrator; Albert H. Quie, Governor of the State of Minnesota; Richard P. Braun, Commissioner of the Minnesota Department of Transportation; James J. Hiniker, Jr., Commissioner of the Minnesota Department of Administration; Lowell Jackson, Secretary of the Wisconsin Department of Transportation; and Cleco Construction Company, Inc., Defendants.

Civ. No. 5–80–39.

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 28, 1980.

Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., John R. Murphy, Asst. Atty. Gen., St. Paul, Minn., Charles R. Larsen, Asst. Atty. Gen., Madison, Wis., Timothy O'Brien and Peter F. Greiner, Minneapolis, Minn., for defendants.

John G. Engberg and Roger A. Peterson, Peterson, Engberg & Peterson, Minneapolis, Minn., for plaintiffs.

Richard Kyle, Jr., Briggs & Morgan, St. Paul, Minn., for U. S. Steel Corp.

John B. Gordon, Faegre & Benson, Minneapolis, Minn., for Armco, Inc., and Bethlehem Steel Corp.

John M. Donovan, Duluth, Minn., for Inland Steel Co. and Jones & Laughlin Steel Corp.

William T. Egan and Timothy Thornton, Rider, Bennett, Egan & Arundel, Minneapolis, Minn., for Republic Steel Corp.

## ORDER

MILES W. LORD, District Judge.

### I. FACTS

On August 12, 1974, the States of Minnesota and Wisconsin entered into an agreement wherein the states agreed to cooperate in the construction of a proposed new Arrowhead Bridge spanning the St. Louis River between Duluth, Minnesota, and Su-

perior, Wisconsin. The agreement essentially provided that the states would cooperate in the apportionment of the costs of construction, engineering, operation and maintenance of the new bridge. The states also agreed to cooperate with the Federal Highway Administration and to seek to obtain federal funding for the bridge project; the states agreed to share equally in that portion of the cost of the new bridge which was not paid by the federal government. The 1974 agreement was amended, in August 1979, to take into account the fact that federal funding for the Arrowhead Bridge would come from a nationwide appropriation of discretionary bridge funds authorized by the Surface Transportation Assistance Act of 1978. The Amended Agreement provided that the federal government would fund eighty percent (80%) of the cost of the project; each state would be responsible for half of the balance. The agreement provided that Wisconsin would undertake the design, and prepare the contract plans and specifications for the various projects included in the bridgework and, further, would administer those contracts; all of the functions undertaken by the State of Wisconsin were subject to the approval of the State of Minnesota. In addition, each state was responsible for and would bear the cost, subject to reimbursement by federal funding, for the necessary approach work on their side of the river.

Wisconsin, with the concurrence of Minnesota and the Federal Highway Administration, determined that there would be approximately 14 prime contracts let for the bridge job. Included as one of the 14 prime contracts was the contract involved in the instant case, the Minnesota-Wisconsin Arrowhead Bridge Main Span Contract. The main span contract was scheduled for letting on December 18, 1979, and the State of Wisconsin advertised for bids based upon that letting date. The main span contract consisted of the construction of the superstructure steel on the main span of the bridge and all incidental items necessary to complete the work for that main span. The proposal for the main span contract was prepared by the State of Wisconsin, Depart-

ment of Transportation, and was reviewed and approved by both the State of Minnesota and the Federal Highway Administration. The work required thereunder involved fabrication and erection of approximately 2,700 tons of structural steel to form the main span of the new Arrowhead Bridge.

The proposal sent to bidders contained a provision requiring bidders to submit a bid for domestic steel and also, if they so elected, submit an alternative bid using non-domestic structural steel. The proposal specified that the contract would be awarded to the lowest responsible bidder who submitted a bid to furnish domestic structural steel, unless such total bid exceeded the lowest total bid based upon furnishing non-domestic, or foreign steel, by more than 10 percent. This proposal was issued in accordance with section 401 of the Surface Transportation Assistance Act of 1978, and the federal regulation enacted pursuant thereto, 23 C.F.R. § 635.410 (1979).

On or about September 18, 1979, the State of Wisconsin awarded two contracts for substructure work in the total amount of approximately $10,350,000.00. On or about December 18, 1979, another substructure contract for the bridge was awarded in the amount of approximately $4,715,000.00.

Defendant Cleco Construction Company of St. Paul, Minnesota (Cleco), after reviewing the advertisement for bids and requesting and receiving plans and a proposal for the bid for the main span work, determined to submit a bid on this project. Cleco submitted its proposal on December 18, 1979; its proposal contained prices based upon both domestic steel and foreign steel.

Seven bids were received based upon domestic steel and two of the seven bidders also submitted a foreign steel alternate for the main span project. On or shortly after December 18, 1979, the State of Wisconsin determined that Cleco's bid utilizing the foreign steel alternate was the lowest responsive bid. In addition, the State of Wisconsin determined that the lowest bid based upon furnishing domestic structural steel

exceeded Cleco's bid by more than ten percent. Cleco's foreign steel alternate bid was in the amount of $6,825,886.10; the next lowest bid, Pittsburgh-Des Moines Steel Company's bid, was in the amount of $7,764,683.26.

On December 20, 1979, the Wisconsin Department of Transportation recommended to the Minnesota Department of Transportation that the main span contract be awarded to Cleco since the lowest domestic steel bid was 13.8 percent in excess of Cleco's foreign steel alternate bid. On December 26, 1979, the Minnesota Department of Transportation contacted the Wisconsin Department of Transportation indicating its concurrence in awarding the Cleco bid. Thereafter, on December 28, 1979, the Wisconsin Department of Transportation notified Cleco, by letter, that it had been awarded the contract, and enclosed the contract and bond for execution. Cleco executed the contract and bond and returned both to the State of Wisconsin. The State of Wisconsin reviewed the contract and bond, and forwarded the documents to the State of Minnesota for execution.

Prior to the execution of the contract by the Minnesota defendant, plaintiffs brought the instant action seeking to enjoin the execution and performance of the main span contract, and the committing of any federal or state funds for the construction project on the grounds that such would violate section 401 of the Surface Transportation Assistance Act of 1978, Pub.L.No.95–599, 92 Stat. 2689, 2756 (1978), and Minn. Stat. § 16.073.

## II. DISCUSSION

A. Standing.

■ Standing is simply the requirement that a party seeking redress in the federal courts have "a sufficient stake in an otherwise justiciable controversy." *Sierra Club*

*v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). In an effort to determine whether the plaintiffs in the instant action have such a "sufficient stake," it is necessary to make two inquiries:

1) Have the plaintiffs alleged that the defendants' acts will cause them injury in fact; and

2) Is the interest sought to be protected "arguably within the zone of interests to be protected or regulated by the statute". *Assn. of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). *See also Rodeway Inns of America, Inc. v. Frank,* 541 F.2d 759, 763–65 (8th Cir. 1976); *Churchill Truck Lines, Inc. v. United States,* 533 F.2d 411, 416 (8th Cir. 1976); *Blue Cross Association v. Califano,* 473 F.Supp. 1047, 1058–59 and n. 16 (W.D.Mo.1979). *But see Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1212 and n. 4 (8th Cir. 1972).

■ The Court finds that both inquiries are affirmatively satisfied. The plaintiffs have alleged that if Cleco's foreign bid is ultimately accepted and Japanese steel is used in the main span of the new Arrowhead Bridge, it would result in a total wage loss to the steelworkers employed at PDM of roughly $357,000. The steelworkers reasoned that with regard to this specific contract, it would require 26,450 man hours to produce the amount of steel needed for the main span. The average hourly rate of this man hour time would total $13.50.[1] Accordingly, the total wage loss would exceed $357,000.

It seems clear, in the case at bar, that the international unions have standing to initiate this suit on behalf of its members. It seems beyond question that its members who will suffer wage loss would have standing to bring this action; the interests sought to be protected by these internation-

---

1. This figure takes into account a factor of $2.50 per hour with respect to non-monetary fringe benefits. This rate of pay was not disputed at the hearing.

Counsel executed a stipulation regarding the International Association of Bridge, Structural & Ornamental Iron Workers which effectively established their "stake in the outcome." The stipulation provided that their members stand to lose approximately $600,000 if PDM is not awarded the contract for production and supply of domestic steel.

al unions are germane to the organizations' purposes, and neither the plaintiffs' claims nor their requested relief require the participation of any individual union members in the law suit. *See Hunt v. Washington State Apple Advertising Comm'n.,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).

Accordingly, this Court determines that these plaintiffs have a sufficient enough stake in the outcome of the litigation to establish standing.

*Data Processing, supra,* indicated that a party must establish that the interest sought to be protected is "arguably" within the zone of interests protected or regulated by the statute in question.[2] 397 U.S. at 153, 90 S.Ct. at 829.

This "nexus" element is explained in part by the judiciary's concern to assure that parties to a law suit will assume an adversary position, thus sharpening the legal questions necessary for the Court's determination. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). *See also Tribe, American Constitutional Law* § 3–22 at 99 (1978). In the instant case, these plaintiffs have assumed an active and undisputably adversary role. The fact that the instant case is in the nature of an adversary proceeding, and that the plaintiffs have sharpened the presentation of the legal issues is a gross understatement. The lawyers have battled each other at every stage of the proceeding, and the legal issues are sharp to the touch. Accordingly, the "nexus" requirement noted in *Data Processing, supra,* is present.

These plaintiffs have standing.[3]

**B. The Motion for Preliminary Injunctive Relief**

Plaintiffs move the Court for an Order enjoining Cleco and the state and federal defendants from proceeding with the new Arrowhead Bridge project. Plaintiffs reason that if these defendants were not so enjoined, construction on the main span would continue in violation of section 401 of the Surface Transportation Assistance Act of 1978 and 23 C.F.R. § 635.410 (1979) as well as Minn.Stat. § 16.073. These provisions are the relevant federal and state "Buy America" statutes and the federal regulation governing the "Buy America" section of the Surface Transportation Assistance Act.

After careful review of the entire file, all proceedings and memoranda, the Court determines that it must deny plaintiffs' motion.[4]

*(1) The Eighth Circuit Standard*

 In this Circuit, it seems well decided that a preliminary injunction shall not issue unless: (1) the moving party can show substantial probability of success on the merits, *and* the possibility of irreparable injury if the injunctive relief is denied; *OR* (2) the moving party must show that there are serious questions going to the merits to make the question a fair basis for litigation, *and* a balancing of the hardships tips decidedly in his favor. *See Minnesota Association of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare,* 602 F.2d 150, 152 (8th Cir. 1979); *Campbell "66" Express, Inc. v. Rundel,* 597 F.2d 125, 127 (8th Cir. 1979); *Dakota Wholesale Liquor, Inc. v. Minnesota,* 584 F.2d 847, 848–49 (8th Cir. 1978); *Modern Controls Inc. v. Andreadakis,* 578 F.2d 1264, 1267 n. 4 (8th Cir.

---

**2.** This "nexus requirement is not constitutionally compelled by Article III. It is merely a prudential limitation upon the exercise of this Court's jurisdiction. *See Craig v. Boren,* 429 U.S. 190, 193–94, 97 S.Ct. 451, 454–55, 50 L.Ed.2d 397 (1976). *See also Tribe, American Constitutional Law* § 3–22 at 97–98 n. 2 (1978). *See Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1212 n. 4 (8th Cir. 1972).

**3.** The steel companies were joined involuntarily by this Court's Order. It seems clear to this Court that their interest in the litigation is as strong as, if not even stronger than the plaintiff unions.

**4.** It would appear that this Order is immediately appealable under 28 U.S.C. § 1292(a)(1) (1976).

1978); *Fennell v. Butler,* 570 F.2d 263, 264 (8th Cir. 1978). It seems apparent that this Court must address plaintiff's motion for a preliminary injunction under both tests.

The traditional test is a conjunctive test. The plaintiffs must establish both that there is a substantial likelihood of success on the merits, *and* that if the injunction does not issue, the plaintiffs may possibly suffer irreparable injury. *See Minnesota Bearing Co. v. White Motor Corp.,* 470 F.2d 1323, 1326 (8th Cir. 1973).

With regard to the first conjunct, the Court determines that there is *not* a substantial likelihood that plaintiffs will succeed on a trial on the merits. The heart and soul of plaintiffs' case rests upon their interpretation of section 401 of the Surface Transportation Assistance Act of 1978, Pub. L.No.95–599, 92 Stat. 2689, 2756 (1978), and Minn.Stat. § 16.073. The Court declines to adopt plaintiffs'. interpretation of these statutory provisions.

(a) *Surface Transportation Assistance Act of 1978*

■ Plaintiffs allege a violation of section 401(a) of the Surface Transportation Assistance Act of 1978, Pub.L.No.95–599, 92 Stat. 2689, 2756 (1978); *see* 49 U.S.C.A. § 1602, note (Supp.1979). Section 401 is the "Buy America" provision of the Act. The issues raised by the plaintiffs in the instant case necessitate a construction of section 401. Unfortunately, there appear to be no reported cases construing the language of this section; it is apparently a question of first impression.

Section 401 provides:

Sec. 401. (a) Notwithstanding any other provision of law, the Secretary of Transportation shall not obligate any funds authorized to be appropriated by this Act or by any Act amended by this Act and administered by the Department of Transportation, whose total cost exceeds $500,000 unless only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as

have been manufactured in the United States substantially all from articles, materials, and supplies mined, produced, or manufactured, as the case may be, in the United States, will be used in such project.

(b) The provisions of subsection (a) of this section shall not apply where the Secretary determines—

(1) their application would be inconsistent with the public interest;

(2) in the case of acquisition of rolling stock their application would result in unreasonable cost (after granting appropriate price adjustments to domestic products based on that portion of project cost likely to be returned to the United States and to the States in the form of tax revenues);

(3) supplies of the class or kind to be used in the manufacture of articles, materials, supplies that are not mined, produced, or manufactured in the United States in sufficient and reasonably available quantities and of a satisfactory quality; or

(4) that inclusion of domestic material will increase the cost of the overall project contract by more than 10 per centum.

*Id.*

Structurally, section 401 contains two main provisions; it contains the *operative* "Buy America" provision in subsection (a), and an *exceptions* provision in subsection (b). Essentially, section 401(a) provides that the *Secretary of Transportation shall not obligate* any funds for projects whose total costs exceed $500,000., otherwise authorized under the Act, unless:

1) all *unmanufactured* articles, materials, and supplies used in the project have been mined or produced in the United States; *and*

2) all *manufactured* articles, materials and supplies used in the project have been manufactured in the United States. These manufactured articles shall be substantially comprised of materials and supplies either

mined,[5] produced or manufactured in the United States.

Section 401(b) provides four exceptions to the "Buy America" rule; for purposes of disposing of the instant case, it is only necessary to construe subsection (4).[6]

The specific language of section 401(b)(4) is integral to the disposition of this case; this subsection provides that the "Buy America" rule shall not apply where the Secretary determines:

> "that inclusion of domestic material will increase the cost of the *overall project contract* by more than 10 per centum."

5. It would appear that the Court cannot specifically pinpoint the source of the domestic iron ore proposed to be used. The manufactured steel which is the subject of this litigation is comprised of a mixture of American and Canadian iron ore. It is manufactured in America.

6. Counsel have indicated that subsections (2) and (3) are in no way involved in the present litigation. It is clear that this case does not involve the acquisition of rolling stock; nor can it be meaningfully asserted that iron ore is not mined in sufficient quantity and quality. Likewise, subsection (1) does not concern the case at bar.

7. The term "overall project contract," is not defined in the Act. The term "project" is, however, defined in 23 U.S.C. § 101(a) (1976); this section provides:

> The term "project" means an undertaking to construct a particular portion of a highway, or if the context so implies, the particular portion of a highway so constructed.

*Id.*
"Overall project contract" is defined at 43 Fed. Reg. 57,146 (1978). The Urban Mass Transportation Administration promulgated a regulation construing this phrase in the context of the Surface Transportation Assistance Act of 1978. It defined the term in this fashion:

> "Overall project contract" means each individual third party contract for a discrete portion of the overall project.

*Id.* (To be codified at 49 C.F.R. § 660.13(h) (1979)).
The Federal Highway Administrator has promulgated a regulation in an effort to comply with the "Buy America" provision in the Surface Transportation Assistance Act. That regulation provides:

> *Buy America requirements.*
> (a) The provisions of this section shall prevail and be given precedence over any requirements of this subpart which are contrary to this section.

Pub.L.No.95–599, 92 Stat. 2689, 2756. 49 U.S.C.A. § 1602, note (Supp.1979). (Emphasis added).

What is at issue here concerns what is meant by the phrase "overall project contract."[7] The plaintiffs contend that this subsection would provide an exception to the "Buy America" rule only if the use of the foreign steel would reduce the cost of the entire bridge project by more than ten percent. The cost of the entire project is estimated at $60,000,000. Defendant Cleco's bid using Japanese steel is $6,825,866. The next lowest bid using domestic steel is Pittsburgh-Des Moines Steel Co. at $7,764,-

> (b) No Federal-aid highway construction project is to be authorized for advertisement or otherwise authorized to proceed unless at least one of the following requirements exist:
> (1) The project has a total estimated cost of less than $450,000;
> (2) The project includes no structural steel. Structural steel is defined as shapes, plates, H-piling, and sheet piling;
> (3) The project is undertaken pursuant to 23 U.S.C. § 117 and the State's laws, regulations, directives and standards are adequate to accomplish the policies and objectives of § 401 of the Surface Transportation Assistance Act of 1978, Pub.L. 95–599;
> (4) The State has in effect standard contract provisions that favor the use of domestic materials and products, including structural steel, to the same or a greater extent than the provisions here set forth; or
> (5) A bidding procedure described as follows is used. A separate bid item is to be set up for furnishing structural steel to the project site. For this bid item, bidders are to be given the opportunity of submitting a bid for (i) furnishing domestic structural steel, or (ii) submitting a bid for furnishing domestic steel and a bid for furnishing foreign steel. Bidders are to be advised that the contract will be awarded to the bidder who submits the lowest total bid based on furnishing domestic structural steel unless such total bid exceeds the lowest total bid based on furnishing foreign structural steel by more than 10 percent. The determination of foreign or domestic character is based on place of manufacture, and the origin of more than 50 percent of its components.
> (c) Where appropriate, the effective date of application of this section is November 6, 1978.

23 C.F.R. § 635.410 (1979).
The language of this regulation seems to indicate that a "project" consists of distinct bids and contracts. *See also* 23 U.S.C. § 101(a) (1976), *supra.*

683. The dollar differential between Cleco and PDM concerns an increase of $938,817; this differential represents less than 2 percent of the cost of the entire project.

It is clear that if what is meant by "overall project contract" is the cost of the *entire* project, then the increased cost of using domestic steel for the main span of the Arrowhead Bridge will not trigger the exception to the "Buy America" rule. It seems clear to the Court, however, that practically the statute should not be so construed.[8]

Section 401 directs that the Secretary "shall not obligate any funds" unless the "Buy America" rule is satisfied or excepted. It seems clear that no money is obligated for construction under the grant in aid program until the state submits a set of plans, specifications and an estimate (PS&E) to the proper Division Administrator of the Federal Highway Administration.[9]

For larger projects of the kind at issue in the instant case, funds are not obligated for the entire project. Instead, the state segments the entire project and lets contracts for each segment. When the state approves each segment's bids, it files a PS&E with the proper Division of the Federal Highway Administration; when that District's Administrator approves the state's PS&E for each segment, the money is obligated.

Accordingly, the Secretary *must* determine, with regard to each segment in excess of $500,000., whether the "Buy America" rule is applicable. Likewise, the exceptions in section 401(b) apply to each qualifying segment. In this regard, the District Administrator of the Federal Highway Administration responsible for the Arrowhead Bridge Project determined that using Japanese steel in the main span segment would realize over a 13 percent savings from the lowest bid using domestic steel. Based upon this finding, it was correctly assumed that the "Buy America" rule did not apply to this segment.

Segmenting one large project into separate contracts is not only reasonable, it is the only economically feasible method of

8. It is the plaintiffs' contention that the overall price or the overall estimate for the entire project is the one hundred percent (100%) figure to which the ten percent (10%) figure should be compared. The overall project requires gravel, cement, earth, rock, reinforcing rods, and other materials which go into the earthen interchanges and approaches to the bridge. In the instant case, plaintiffs argue that since the proposed bridge is replacing an existing bridge, then even the cost of tearing down the existing bridge should be counted as a part of the one hundred percent (100%) figure to which the ten percent (10%) figure should be compared. If this interpretation of the statute is to be followed, it would leave the legislation so undefined as to make it impossible to interpret, and lead toward an unreasonable result. *See United States v. Mendoza*, 565 F.2d 1285, 1288 (5th Cir. 1978).

If it were Congress' intention to require the Court to consider the cost of the entire bridge project in applying the § 401 ten percent (10%) formula, then, based upon the evidence, it is clear that no foreign steel could ever legally be used in a bridge project constructed pursuant to the Surface Transportation Assistance Act. The only possible way foreign steel would qualify under section 401 in that case would be where the foreign steel was sold below the cost of its production, in violation of our antitrust and trade regulation laws. That is not found to be the case here.

It is clear that Congress intended to place a 10 percent "hurdle" before foreign steel manufacturers which compete with American firms in the American market. If this Court were to adopt the plaintiffs' interpretation of § 401, it would effectively construct an obstacle over which foreign manufacturers could not possibly climb. If this were Congress' intention, it could have forbade outright the use of foreign steel in federally assisted public projects; this was not Congress' intention, nor can I construe it to be the effect of its Act.

Accordingly, the only reasonable interpretation of § 401 requires that the ten percent (10%) formula be applied to the contract specifically dealing with the structural steel used in the main span. The ten percent (10%) figure cannot be compared with the cost of the entire bridge project.

9. Where the project concerns a bi-state bridge, the two states determine which state will be responsible for the administration of the contract. For administrative ease, the division office of the Federal Highway Administration which deals with such state is responsible for the federal aspects of the contract administration. In the instant case, Wisconsin is the lead district for the Arrowhead Project which actually impacts two separate districts.

approach. It is simply a matter of economic fact that segmenting the entire project into separate contract lettings produces a higher level of competitive bidding, and reduces the overall project cost by reducing the cost of each of the overall project contracts. The paradigm of public bidding is to secure a bid that is firm and cheap;[10] clearly this can only be done by letting separate contracts as the entire project progresses.[11] To the extent that the state can let contracts for smaller segments of the entire project and secure completion of each segment in one construction season, it remains one step in front of inflation.

There are other factors favoring segmenting of large projects. Where smaller contracts are let, local business concerns become more active in the bidding process. This raises the level of competition among bidders. Finally, where larger projects are involved, it frequently arises that the project is designed to be completed in separate stages; separate contracts are let in an effort to stay current with the project's present design needs.

Practically, large scale bridge projects are not let as one all-encompassing contract; generally separate contracts covering the approach fills on each end, paving on each end, the substructure and sheet pilings, the superstructure, the approach spans' superstructures, and the main span superstructure steel, are often let as individual contracts.

For purposes of section 401(b)(4), this Court determines that the 10 percent exception applies to each segment let by the state as a separate contract. Accordingly, the procedure followed by the District Adminis-

trator of the Federal Highway Administration was proper under the Act. He correctly determined that use of domestic steel in the instant case would increase the cost of this segment by over 10 percent and therefore the 401(b)(4) exception effectively barred enforcing the "Buy America" rule.

Finally, notwithstanding the legislative history of section 401 which plaintiffs' counsel stressed to the Court, the Federal Highway Grant in Aid Program was established to connect America's population centers, bolster interstate commerce with adequate interstate transportation, and provide for the nation's defense. Its primary purpose was not to specifically increase employment on a national level; it is a road building program. The Court finds that section 401(a) of the Surface Transportation Assistance Act of 1978 has not been violated by the actions of either the state or federal offices involved herein.

(b) *The Minnesota Buy America Act*

■ The Minnesota Act is codified at Minn.Stat. § 16.073; it provides in relevant part:

> Subd. 2. Purchase preference. Notwithstanding the provisions of any other law to the contrary, no materials shall be purchased by the state for use for governmental purposes which are not manufactured in the United States, except as may be provided in this section. When all other factors are substantially equal, preference shall be given to those products which are manufactured to the greatest extent in the United States. To the extent possible, specifications shall be written so as to permit the state to pur-

---

**10.** *See generally Citizens Organized to Defend the Environment, Inc. v. Volpe,* 353 F.Supp. 520, 531 (S.D.Ohio 1972).

**11.** With regard to the "letting of contracts," *see* 23 U.S.C. § 112 (1976). This section provides:

(a) In all cases where the construction is to be performed by the State Highway Department or under its supervision, a request for submission of bids shall be made by advertisement unless some other method is approved by the Secretary. The Secretary shall require such plans and specifications and

such methods of bidding as shall be effective in securing competition.
(b) Construction of each project, subject to the provisions of subsection (a) of this section, shall be performed by contract awarded by competitive bidding . . . . Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. . . .
*Id.* This language indicates that more than one contract is contemplated for each project.

chase materials manufactured in the United States.

Subd. 3. Exemptions. Subdivision 2 shall not apply if the person having contracting authority in respect to the purchase determines that . . . (2) the price or bid of the materials unreasonably exceeds the price or bid of available and comparable materials manufactured outside of the United States . . . .

Minn.Stat. § 16.073. The Minnesota "Buy America" Act is new legislation; the Court has been unable to find any case law construing this section.[12] Accordingly, the Court is left with the responsibility of construing the language of the statute in a reasonable fashion.

It is clear that the operative provision of the Minnesota Act states a "qualified preference" for American materials. Where all factors are substantially equal, preference must be given to materials manufactured in the United States.

Section 16.073 is equipped with an exceptions provision. Unlike its federal counterpart, section 401, it has no 10 percent increase formula. The Minnesota statute provides that the "Buy America" rule does not apply to the purchase of any materials for a public purpose where the person with contracting authority determines that the price of the domestic materials "unreasonably" exceeds the cost of the foreign materials.

The person with contracting authority employed by the State of Minnesota is Richard P. Braun, Commissioner of Transportation for the state. Mr. Braun noted that the cost difference between Cleco Corporation's bid and the next lowest bid using domestic steel exceeded $938,000. The Commissioner determined that this dollar figure was unreasonably excessive. This Court will not disturb the Commissioner's finding.[13]

■ Accordingly, based upon the Court's interpretation of these statutory provisions, it is not likely that plaintiffs will succeed in a trial on the merits.[14]

The Eighth Circuit Court of Appeals recently adopted the Second Circuit test regarding motions for preliminary injunctive relief. See Gresham v. Chambers, 501 F.2d 687, 691 (2d Cir. 1974); Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973). The Eighth Circuit, in Fennell v. Butler, 570

12. The constitutionality of a similar statute was raised as an issue in K.S.B. Technical Sales Corp. v. North Jersey Dist. Water Supply Comm'n, 75 N.J. 272, 381 A.2d 774 (1977), appeal dismissed 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). The New Jersey Supreme Court ruled that its "Buy America" statute was neither preempted by the General Agreement on Tariffs & Trade, nor did it infringe on the federal foreign affairs or commerce powers. At least one commentator has suggested that such legislation on a state level is clearly unconstitutional. See Note, 64 Minn. L.Rev. 389, 411–12 (1980). The constitutionality of Minn.Stat. § 16.073 has not been raised as an issue in the instant case; with regard to this question, the Court renders no opinion.

13. This $938,000 difference represents over a 13 percent increase where domestic steel is used. To the extent that the increase exceeds 10 percent, this Court believes that the Commissioner's determination should not be overturned as an abuse of discretion. If it were the case that the increase in use of domestic steel was less than 10 percent, then the Commissioner's finding of "unreasonable excess" may well be construed as an abuse of discretion. In the·

latter case, the Commissioner's determination would conflict with the federal requirement. Fortunately, the instant case does not present this question, and upon this issue the Court renders no final opinion.

14. The traditional test requires satisfaction of both conjuncts to secure injunctive relief; to the extent that plaintiffs have failed to satisfy the first conjunct, they cannot prevail under this test. With regard to the second conjunct in the traditional test, suffice it to say that after careful review of the entire file and all proceedings to date, the Court finds that plaintiffs will not suffer irreparable harm if the Cleco contract were executed and construction continued. The Court finds that, at worst, plaintiffs would suffer a minimum of injury. The states have indicated that the main span of the bridge is the only portion of the entire project that will include foreign steel. The remainder of the project, to the extent that the necessary materials therefore will involve steel, will not occasion any loss to these plaintiffs. See Minnesota Bearing Co. v. White Motor Co., 470 F.2d 1323, 1327–28 (8th Cir. 1973).

F.2d 263 (8th Cir. 1978), ruled that this Court must consider an alternative test in ruling on a motion for preliminary injunctive relief.[15] This alternative test requires the Court to determine whether the plaintiffs have shown: "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [them]." *Id.* at 264.

This alternative test is likewise a conjunctive formula; plaintiffs must affirmatively satisfy *both* conjuncts in order to secure their requested relief. The Court finds that plaintiffs have failed to make the requisite showing.

■ With regard to the first conjunct, the Court determines that plaintiffs have *not* raised sufficiently serious questions going to the merits to justify granting their requested injunction. This element requires essentially the same inquiry that the Court made with regard to the first conjunct in the traditional test. The alternative test differs in that its standard requires a lesser showing. The new test does not require plaintiffs to establish that their position is likely to prevail in a trial on the merits. Instead, this alternative test merely requires that the Court determine that sufficiently serious questions supporting their position are present, justifying a trial on the merits. Even under this lesser standard, the Court finds that plaintiffs have failed to make the required showing. Under either test, in order for plaintiffs to secure their relief, this Court must adopt their interpretation of the relevant statutes here in question; this Court declines to do so.[16]

Although plaintiffs' failure to satisfy the first conjunct of the alternative test ought to dispose of the present motion, it should be noted that plaintiffs, likewise, fail to satisfy the second element of the new test. A balancing of the hardships does not tip decidedly in the plaintiffs' favor. In fact, it appears to the Court that the state and federal defendants' damages, as a result of delay, will exceed those damages alleged to be suffered by the plaintiffs in the instant case. The damages alleged to be suffered by the plaintiffs total approximately $957,-000. Defendants could suffer anywhere from between a 1 million to 5 million dollar loss for a delay of anywhere between two weeks and six months.

In balancing these potential losses as hardships, the Court finds that the scale does not tip decidedly toward the plaintiffs.*

### III. ORDER

Accordingly, it is Ordered that plaintiffs' motion for a preliminary injunction be and hereby is denied. Defendants are stayed from proceeding with execution of and construction pursuant to the Cleco contract for a period of ten days pending appeal.

---

**15.** Judge Alsop, in *Woida v. United States*, 446 F.Supp. 1377 (D.Minn.1978), has noted that the linguistic differences of the two tests do not reflect substantial disagreement. *Id.* at 1383 n. 1.

**16.** *See* discussion of § 401 and Minn.Stat. § 16.073, *supra.*

* Plaintiffs' original complaint contained allegations that the Japanese steel at issue was

"dumped" into the American market and thus opened the way to a broad inquiry into pricing and dumping generally. This inquiry, on the surface, necessitated the joinder of the American steel companies. Their participation in the case brought forth one witness who represented all the steel companies; their obvious primary interest in the action renders it improvident that they be dismissed at this stage of the litigation.